**AFROS S.P.A., Plaintiff,**

v.

**KRAUSS–MAFFEI CORPORATION, Defendant.**

**Civ. A. No. 84–358 MMS.**

United States District Court, D. Delaware.

Aug. 17, 1987.

John G. Mulford, of Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, Del. (Carl G. Love, William K. West, Jr., Esq., and Peter W. Gowdey, of Cushman, Darby

& Cushman, Washington, D.C., of counsel), for plaintiff.

William D. Bailey, Jr., of Bayard, Handelman and Murdoch, P.A., Wilmington, Del. (Robert J. Koch, and James W. Hellwege, Alexandria, Va., of counsel), for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Plaintiff Afros, S.p.A. ("Afros") has sued Krauss-Maffei Corporation ("KMC") for infringement of its United States Letters Patent No. 4,332,335 ("'335 Patent"). KMC, a wholly-owned subsidiary of Krauss-Maffei Aktiengesellschaft ("KMAG"), denies any infringement and counterclaims for infringement by Afros of its United States Patents No. 3,706,515 ("'515 Patent") and No. 3,975,128 ("'128 Patent"). All three patents relate to high-pressure impingement mixing used to produce polyurethane products. The parties manufacture or distribute mixing heads for use in both open and closed pour molds.

The Court conducted a nine-day trial on liability issues that concluded on February 27, 1987. By the parties' consent, the damages issue has been reserved for a later proceeding. Post-trial argument occurred on April 29 after the filing of proposed findings of fact and briefs. After careful consideration of the sufficiency, weight, and credibility of the witnesses' testimony, their demeanor on the stand, documentary evidence admitted at trial, and the parties' post-trial submissions, the following constitutes the Court's factual and legal conclusions in accordance with Federal Rule of Civil Procedure 52(a). Because the parties each allege infringement of its patents, the Court considers those issues separately.

The Court holds the '335 Patent valid and literally infringed by KMC's mixing heads.

Defendant's infringement is also willful under 35 U.S.C. § 284, and an exceptional case under 35 U.S.C. § 285. On the counterclaim, the Court holds the assignment of the '515 and '128 Patent rights between KMAG and KMC ineffective to grant KMC standing to bring the counterclaim. In the alternative, the Court holds the two patents are valid but not infringed.

## I. BACKGROUND

Oversimplified, flexible foam polyurethane produced by the mixing heads of the parties are the result of a process whereby two polymers are mixed together and deposited in a mold in which they harden to produce the desired item with the correct shape and weight.[1] The mixing procedure, called impingement mixing, takes place in a mixing head.[2] Trial Transcript ("Tr.") 86. The two materials used to form polyurethane, polyol[3] and isocyanate, must be throughly mixed if the product is to be acceptable. Tr. 85. Polymerization begins when the chemicals first interact, but the completion of the process takes varying amounts of time depending on the exact polymers being impinged.

The mixing process requires atomization of the components in a narrow area, where a high degree of turbulence is generated. Tr. 59. The components are delivered under high-pressure, usually at about 200 atmospheres or "bars," Tr. 68, and reach the mixing chamber through ports in the mixing chamber. The mechanism through which the polyol and isocyanate enter the impingement zone is variously called "infeed ducts," "transfer ports," and "inlet nozzles." For the purposes of this opinion, the Court will use the term inlet nozzles to describe the apparatus for delivering components to the mixing chamber. An external pump maintains the necessary pressure during periods of impingement and recirculation. Tr. 158.

---

1. Products of the parties' heads have achieved success in the automotive industry, where polyurethane is used for steering wheels, seat cushions, and dashboards. Polyurethane products are also found in a variety of other areas, too numerous to mention.

2. The mixing heads in this litigation are for Reaction Injection Molding ("RIM").

3. The particular polyol chosen influences the properties of the polyurethane produced, and the reaction time will vary with the component chosen.

KMAG and Afros manufacture mixing heads which are similar in most respects. Both the Afros heads, designated "FPL," and KMAG's, designated "UL,"[4] are L-shape. The L-shape design entails a mixing chamber connected at a 90° angle to a discharge or quieting chamber. The polyurethane flows from the discharge chamber into the mold. The chambers are circular, with the length and diameter of the discharge chamber greater than the mixing chamber. PX 151. The key issue in the design of these competing heads is the closeness of the component inlet nozzles to the discharge chamber in an L-shape head. Under the '335 Patent, the location of those nozzles is to be "close to" or "in close proximity to" the quieting chamber. PX 1. According to Dr. Carlo Fiorentini, inventor of the '335 Patent device, locating the inlet nozzles close to the discharge chamber permits additional mixing in the component flow as it exits the mixing chamber and the residual kinetic energy causes a rebounding effect off the opposite wall of the discharge chamber because of the L-shape configuration of the chambers. Tr. 187–88.

The L-shape heads are the product of nearly a decade of research and development in the Reaction Injection Molding ("RIM") industry. In order to achieve good mixing of the polyol and isocyanate, which have an affinity for one another akin to oil and water, the industry moved toward high-pressure mixing heads in the 1970's. Tr. 1554. Unlike low-pressure heads, high-pressure devices mix the chemicals outside the product mold and then pour the polyurethane directly into it. One problem the industry faced was how to maintain the necessary degree of pressure when the components were not being impinged. The defendant's '515 Patent, which has recirculation grooves carved into the sides of the mixing piston, permits the maintenance of high-pressure in the inlet nozzles whether or not the mixing head is in operation. Tr. 1552–53. When the mixing piston is in a closed position, the recirculation grooves direct the components back through the

pump system into a storage area. The pump maintains the requisite pressure for impingement mixing until the piston is retracted and the inlet nozzles are unobstructed. The use of recirculation grooves was an important step in the development of the mixing heads at issue in this litigation. See Tr. 1552.

The essential principles for RIM have not changed radically since the early 1970's. According to defendant's expert, Dr. Christopher Macosko, the key concepts for high-pressure mixing heads are:

1) High velocity recirculation.

2) Controlling the duration of the mixing and pouring of the fluid.

3) A retractable plunger to clean the chamber that both permits recirculation and terminates impingement.

4) Creating sufficient back pressure in the mixing chamber both to increase mixing efficiency and eliminate air bubbles in the fluid.

Tr. 1550, 1553, 1555. The central element in the head is the mixing piston, also called a "control slide." The piston has two positions, and its movement is controlled by means of a hydraulic pump system. In the forward or closed position, the chemicals recirculate under high-pressure through the recirculation grooves in the piston. When the piston is retracted, in which position the head is "open," it no longer blocks the inlet nozzles and the chemicals discharge into the mixing chamber. The inlet nozzles for the chemicals are positioned opposite each other and, once the head is open, the chemicals will impinge and form a flow that will be deposited into the mold. At the point of impingement, the highly turbulent flow created in the mixing head permits the polyol and isocyanate to continue to mix after the point of impingement. The length of time in which the head is open, called the "shot," depends on the volume necessary to form the product. Tr. 85. It can last from a few seconds up to half a minute. After the shot, the mixing

---

4. "UL" is an abbreviation for the German word "umlenk-kopf," and designates KMC's L-shape

mixing heads.

piston moves forward to both clean the mixing chamber, by forcing any residual matter into the discharge chamber, and recirculates the chemicals.

The discharge chamber, placed at a 90° angle to the mixing chamber, is similarly equipped with a retractable plunger called the cleaning piston. When the shot begins, the cleaning piston will be fully withdrawn, permitting a continuous flow of material out of the mixing chamber into the discharge chamber. Once the mixing piston advances to close the chamber, the cleaning piston will move down to expel any remaining polyurethane. The face of the mixing piston is curved to permit the two pistons to be closed at the same time.

The advantage of high-pressure mix heads is more efficacious mixing than in low-pressure systems. Tr. 1550. The degree of mixing achieved in high-pressure heads will vary, however, depending on a number of factors. There are three major problems to be overcome in constructing a workable high-pressure mixing head: 1) cleaning the mixing and discharge chambers; 2) minimizing what has variously been termed the transient phenomenon or lead-lag problem; 3) creating a good mix while allowing the flow to become laminar, or quieted, at the point of discharge into the mold.

*Cleaning the Head:* Polyol and isocyanate are highly reactive components that begin their chemical reaction upon impingement to form polyurethane. The length of the polymerization will depend on the particular polyol used. Any residual liquid in the chamber will harden, impeding the movement of the piston and degrading the quality of later shots. The chamber through which chemicals flow must be thoroughly cleaned, otherwise a gluing effect occurs in the head. The face of the mixing piston can serve this function when it is moved into the closed position if it is highly precisioned, leaving no space between the piston face and the chamber walls for polyurethane to accumulate. The cleaning process can also be achieved through sealing grooves on the outer edge of the piston that allow a small amount of

polyurethane to form and thereby close off the space between the piston and the wall of the mixing chamber. Tr. 1461; *see infra,* text at 1434–1435. In L-shape heads, which have two chambers at 90° angles, a second piston is required to clean the discharge chamber. Tr. 183–84, 1651. In addition to thoroughly removing residual polyurethane, the cleaning piston must be moved rapidly in order to minimize the possibility of the compound hardening before it can be cleaned out of the chamber.

*Transient Phenomenon:* The design of the mixing piston requires that there be an area between the end of the longitudinal recirculation groove and the piston's face that permits neither recirculation nor impingement of the components. As the piston retracts from a closed to open position, the inlet nozzles are completely blocked, and the pressure in the lines increases. Tr. 112. How high the pressure builds depends on the area between the recirculation grooves and the piston face and the speed with which the piston retracts. This period, called the transient time, will only last milliseconds, but the longer the blockage the greater the effect on mixing because the components are delivered at a higher than optimum pressure that can negatively affect the mixing. Moreover, as the piston face slides past the inlet nozzles, the flow of components into the chamber is directed away from the opposed nozzle, thereby lessening the impingement. This misdirection of components will also occur as the piston moves to a closed position. The off-ratio portions in the flow can cause a poorly formed product that exhibits defects in a localized area as a result of the transient phenomena at the beginning and end of the shot. Tr. 1803.

*Mix/Flow Problems:* The development of high-pressure impingement mixing requires the coordination of two competing objectives: creation of a highly turbulent flow in the head to permit maximum mixing of the components, and a laminar flow out of the head to the mold. If the flow is too chaotic at the point of ejection, then the polyurethane fluid will not fill the mold evenly, creating a poorly formed product. If insufficient turbulence occurs in the

head, then the components will not be properly mixed and, again, a poorly formed product results. It is the delicate balancing of these two objectives that primarily determines the success of the operation of a mixing head. The diameter of the mixing chamber has an important effect on the degree of mixing that will occur in the mixing chamber. The greater the distance between the inlet nozzles, the less the components will mix. If the diameter is too small, however, the flow may not be sufficiently quieted at the point of discharge into the mold to properly form the product. Tr. 456-60.

Prior to 1978, the predominant design of high-pressure mixing heads was straight-line. This type of head had a single piston to clean the chamber and recirculate the components. The polyurethane fluid is mixed and discharged from the same chamber. Manufacturers generally used the devices in a closed-mold system, with the head directly attached to the mold. To eliminate the transient phenomenon, an aftermixer attached to the mold would divert fluid from the beginning and end of the shot into an area away from the actual product mold. The undesirable polyurethane from these segments of the shot contained most of the effects of the transient times. The aftermixer would also serve to further mix the flow as it exited the head by creating an area of blockage that generated additional turbulence. After the polyurethane hardened, the mold was opened and the residue in the aftermixer was discarded.

In addition to possible problems resulting from the size of the mixing chamber, the straight-line technology faced two additional drawbacks. First, in closed-mold systems the mixing head could only be used for discrete operations because the mold had to be removed, cleaned, and reattached before another shot could commence. Attempted application of the heads in open pour molds, where the fluid discharged into a free standing mold not attached to the head and with no aftermixer, proved generally unsuccessful because of poor mixing and splashing of the fluid in the mold. Tr. 170-71. The closed-mold method, there-

fore, increased the time necessary to form a polyurethane product. Second, the residue in the aftermixer was discarded after the mold hardened, an uneconomical use of the polyurethane. Tr. 594. Nevertheless, the straight-line heads were commercially viable, but the industry continued to work on overcoming problems with poor mixing and the need for a head for use with open-pour molds.

Afros and KMAG developed and marketed straight-line heads during the 1970s. In 1978, Dr. Fiorentini submitted a patent application for an L-shape mixing head. Two earlier patents, the KMAG '128 Patent and the Upjohn Company's United States Patent No. 4,155,299 ("Upjohn '299 Patent"), had previously disclosed a high-pressure L-shape head, but the '335 Patent cited only the '128 patent as prior art. The Afros FPL heads, which conform to the description and drawings of the '335 Patent, Pretrial Order, Docket Item ("Dkt.") 127, ¶ 7, have short mixing chambers, less than one mixing chamber diameter. This permits the piston to have a shorter stroke, allowing for a light mixing head because the hydraulic pump system need not generate as much force to operate the pistons. Tr. 180. Moreover, the more rapid movement of the mixing piston limits the transient phenomenon.

According to Dr. Fiorentini, the key to his invention is the continued mixing of the components in the discharge chamber, caused by locating the inlet nozzles close to the discharge chamber, creating a short mixing chamber, in combination with the L-shape configuration. Tr. 187-89. This additional turbulence, which occurs as the polyurethane flow exits the mixing chamber and reaches the walls of the discharge chamber, creates a better mix than in heads with long mixing chambers, either straight-line or L-shape. The transverse placement of the discharge duct, with its greater length and volume as compared to the mixing chamber, permits rapid conversion to a laminar flow despite the added turbulence caused by the design.

The KMAG UL heads are virtually identical to the FPL heads, except for the loca-

tion of the component inlet nozzles. KMC began marketing the UL head in the United States in 1982, Tr. 845, while Afros made its first American sale of the FPL head in 1978. PX 32. Both products have been relatively successful in terms of overall sales, especially in light of stagnant demand in the polyurethane molded products market. The advantage of the L-shape over straight-line heads is their ability to be used for open-pour molds, permitting automization of the manufacturing process. Robotic systems may be employed with L-shape heads, which are more economical because they are less labor-intensive. Products of open pour-systems are at least as good as, and in many cases better than those produced by the earlier straight-line heads. Another advantage is less wasted polyurethane with the elimination of the aftermixer. Plaintiff's evidence shows nearly half its sales have included an entire system for open-pour molding rather than just the FPL head.[5] The heads alone cost between $8,000 and $12,000, and sales have expanded as manufacturers replace straight-line heads with L-shape heads. Tr. 592, 594–95.

## II. THE PATENTS IN SUIT

The three patents in this litigation are stages in the development of high-pressure mixing heads from the straight-line method illustrated in KMC's '515 Patent to the L-shape design of Afros' '335 Patent. The claims in issue are presented below.

### A. The '335 Patent

The Patent, entitled "Head for Mixing and Ejecting Interacting Liquid Components, for Molding Plastic Articles," issued on June 1, 1982. The claims in issue are numbers 1, 6, 8, and 9, which state:

1. A head for continuously mixing and ejecting interacting liquid components into a mold for molding articles made of plastic material, comprising in combination: a body defining a mixing chamber for the components; a discharge duct having an outlet; at least a first and a second infeed duct for inject-

ing individual components into said mixing chamber for a predetermined time period; exit port means for establishing fluid communication between said infeed ducts and said discharge duct, said infeed ducts being provided with outlet orifices that open into said mixing chamber close to said exit port means; and piston means for controlling fluid communication between said infeed ducts and said discharge duct outlet so that fluid communication is established therebetween during substantially the entire predetermined time period when said infeed ducts are injecting components into said mixing chamber so that injected components flow continuously out of said mixing chamber through said discharge duct and are thoroughly mixed during their passage through said discharge duct, said mixing chamber forming an angle of substantially 90° with said discharge duct and having a length shorter than and a volume less than that of said discharge duct so that components injected into said mixing chamber mix with each other and overflow into said discharge duct in a swirling flow.

\* \* \* \* \* \*

6. A head for continuously mixing and ejecting predetermined variable amounts of fluid materials, comprising a body defining a mixing chamber; a discharge duct having at one end an outlet portion for ejecting a mixture, said discharge duct having an inlet communicating with said mixing chamber and having an axis extending transverse to an axis of said mixing chamber; a cleaning member able to slide in the discharge duct between recessed and extended positions, in said recessed position said duct inlet being in fluid communication with said duct outlet portion and in said extended position said cleaning member blocking fluid communication between said duct inlet and said duct outlet portion; a first double acting cylinder for moving said cleaning member between said recessed and said extended positions; a first and a second duct opening into said mixing

5. *See infra,* note 19.

chamber for infeeding individual components, said infeeding ducts being positioned in close proximity to said duct inlet so that mixing action initiated in said mixing chamber continues in said discharge duct; a first and a second duct for recycling the individual components from said mixing chamber; and a slide valve movable between a first position in which selected ones of said infeed and recycling ducts are in fluid communication with each other and fluid communication is blocked between said infeeding ducts and said duct inlet, and a second position in which said infeeding ducts are in fluid communication with said duct inlet and fluid communication is blocked between said infeeding and said recycling ducts; a second double acting cylinder for controlling movement of said slide valve between said first and said second positions; and operating link-up means between said double acting cylinders for moving said slide valve from said first second position after said cleaning member has been moved from said extended position towards said recessed position so that said infeeding ducts, mixing chamber, and discharge duct are in fluid communication with each other during substantially the entire period during which individual components are fed into said mixing chamber so that the components overflow from said mixing chamber into said discharge duct, said operating link-up means comprising a switch operatively associated with said first double acting cylinder, an electrovalve actuated by said switch, a supply circuit of said second double acting cylinder being connected to said electrovalve.

\* \* \* \* \* \*

8. A head according to claim 6, wherein the cross-sectional area and volume of said mixing chamber are less than the cross-sectional area and volume of said discharge duct.

9. A head according to claim 1 or 6, wherein the length of mixing chamber is

very limited compared with the length of the discharge duct.

PX 1.[6]

## B. The Krauss-Maffei '515 Patent

The Patent, entitled "Device for Feeding Flowable Material to a Mold Cavity," issued on December 19, 1972. The relevant claims in issue are numbers 1–3, which state:

1. An apparatus for charging a mold cavity with a mixture of at least two flowable components, comprising housing means forming a mixing chamber opening into said cavity at one end and provided with at least one pair of inlet ports communicating with said chamber and spaced from said end; and a control slide shiftable along said chamber for simultaneously regulating the flow of said components from said inlet ports into said chamber and out of said chamber into said cavity, said control slide having a first position wherein flow of said components from said chamber into said cavity is blocked and a second position in which flow of said components into said chamber and a mixture of the components into said cavity is permitted;

wherein said control slide defines with said housing means respective recirculation channels communicating with said inlet ports in said first position of said control slide, said apparatus further comprising respective pumps communicating with said inlet ports for delivering said components thereto and having intake sides connected with the respective recirculation channels in said first position of said slide.

2. The apparatus defined in claim 1 wherein said control slide is received within said chamber.

3. The apparatus defined in claim 2 wherein said control slide is formed at least at its extremity turned toward said end of said mixing chamber with a cross section corresponding to the cross section of said chamber and an end face

---

**6.** Figures 1 and 2, illustrating two views of the   device, are found at Appendix 1.

adapted to lie flush with a wall of said mold cavity in said first position.

DX 8.

## C. The '128 Patent

The Patent, entitled "System for Filling a Mold with Reactive Synthetic Resin Components," issued on August 17, 1976. The relevant claims in issue are numbers 1–3 and 7, which state:

1. An apparatus for filing a mold, said apparatus comprising:

a housing formed with a quieting chamber opening in one direction into said mold and with a mixing chamber opening in another direction transverse to said one direction into said quieting chamber, said quieting chamber having a cross-sectional area equal to that of said mixing chamber and a width greater than that of the inlet opening into it from said mixing chamber;

means operatively associated with said mixing chamber for injecting a pair of reactive components into said mixing chamber in opposing and impinging jets to form a mixture therein;

means operatively associated with said mixing chamber for displacing said mixture in said other direction into said quieting chamber;

a piston in said quieting chamber; and

means operatively associated with said piston for reciprocating said piston in said one direction in said quieting chamber for displacing said mixture from said quieting chamber into said mold, said quieting chamber being of uniform cross-section in said one direction and has an inner surface formed with said inlet opening, said mixing chamber being of uniform cross-section in said other direction and terminating at said opening.

2. The apparatus defined in claim 1 wherein said means for displacing said mixture in said other direction includes a mixing piston in said mixing chamber having an end face and displaceable between an advanced position with said end face flush with said surface and a retracted position with said end face spaced in said mixing chamber from said surface, said piston being formed with passages for recirculating said components in said advanced position.

3. The apparatus defined in claim 2 wherein said end face is so formed that in said advanced position of said mixing piston said end face completely fills said opening and is continuous with said inner surface.

\* \* \* \* \* \*

7. The apparatus defined in claim 1 wherein said one direction is perpendicular to said other direction.

DX 9.[7]

In the prosecution of the patent, the Examiner required an amendment to Claim 1 before he would permit the issuance of the patent. The new language limited the claim by requiring that "said quieting chamber having a cross-sectional area equal to that of said mixing chamber and a...." PX 229 at 71.

## PART ONE: THE AFROS PATENT

## III. VALIDITY OF THE '335 PATENT

Plaintiff alleges the KMC UL mixing heads literally infringe its Patent. Defendant argues the invalidity of the '335 Patent as being obvious under 35 U.S.C. § 103 and indefinite under 35 U.S.C. § 112, second paragraph. In addition, defendant asserts the '335 patent is unenforceable because of inequitable conduct by Afros before the Patent and Trademark Office ("PTO"). The gravamen of the inequitable conduct charge is plaintiff's failure to cite the Upjohn '299 Patent as prior art. The Court will determine validity before considering whether defendant's UL heads infringe the '335 Patent.

---

7. Figures 5 and 6, giving the general design of the device with the head open and closed, is

Appendix 2.

## A. Obviousness

Under 35 U.S.C. § 103,[8] the Court determines "whether the claimed invention *would have been* (not 'would be' ...) obvious at the time the invention was made...." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed. Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987) (emphasis in original). Obviousness is a question of law. *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566–68 (Fed. Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987) (opinion on remand). The principle underlying the Court's analysis is the presumption of validity for all patents. 35 U.S.C. § 282. *See Panduit Corp. v. Dennison Manufacturing Co.*, 774 F.2d 1082, 1096 (Fed.Cir.1985) ("Patents are born valid."), *vacated,* 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986), *aff'd on remand,* 810 F.2d 1561 (Fed.Cir.1987). The burden of proving patent invalidity is on the challenger, under the clear and convincing evidence standard. *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed.Cir. 1986). Evidence of material uncited art in the patent prosecution does not affect the presumption of validity, although it may effectively make it easier for the challenger to carry the burden of proof. *See Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed.Cir.1984).

In order to reach its legal conclusion under § 103, the Court must make the fourfold factual findings required by *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

1) the scope and content of the prior art;

2) the difference between prior art and the claims at stake;

3) the level of ordinary skill in the art;

4) objective [secondary] evidence of non-obviousness.

*Akzo N.V. v. United States International Trade Commission*, 808 F.2d 1471, 1480 (Fed.Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987); *Bausch & Lomb*, 796 F.2d at 447; *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985). Only upon conclusion of the *John Deere* factual analysis may the Court decide the legal issue of obviousness.[9]

### 1. Scope and Content of the Prior Art

The scope of the prior art is that which is "reasonably pertinent to the particular problem with which the inventor was involved." *Lindemann Maschinenfabrik*, 730 F.2d at 1460 (quoting *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1535 (Fed.Cir.1983)). *See Bausch & Lomb*, 796 F.2d at 449. The defendant argues that, in addition to the '515 Patent, United States Patent No. 4,175,874 ("Schneider '874 Patent") and the Upjohn '299 Patent, both of which plaintiff failed to cite to the Examiner, are relevant prior art. The Upjohn '299 Patent, entitled "Frothing Method and an Apparatus for Carrying Out the Method," details a high-pressure mixing head adaptable for use in an L-shape configuration. DX 215. Defendant asserts the inclusion of this prior art, in combination with the references cited to the Examiner renders the '335 Patent obvious.

The Upjohn '299 Patent is clearly pertinent, in the broad sense of the word, because it exhibits a number of features in both the cited prior art and the '335 Pat-

---

8.    A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. 35 U.S.C. § 103.

9.    A § 103 determination involves fact and law. There may be these facts: what a prior

art patent as a whole discloses; what it in fact disclosed to workers in the art; what differences exist between the entire prior art, or a whole prior art structure, and the whole claimed invention; what the differences enabled the claimed subject matter as a whole to achieve; that others for years sought and failed to arrive at the claimed invention; that one of those others copied it; that the invention met on its merits with outstanding commercial success.

*Panduit Corp.*, 810 F.2d at 1566.

ent.[10]   The Patent's primary teaching is the introduction of a frothing agent [11] through a diametrically opposed chamber that will mix with the previously mixed polyol and isocyanate at the intersection of the two chambers.   At this point, the frothing agent or propellant will interact with the polyurethane flow as both descend through the discharge chamber.   The design is essentially L-shape, with a second mixing head attached to provide a discharge chamber.   The Upjohn '299 Patent provides for continuous fluid communication between the two chambers when the head is in operation.   The chemical components impinge through diametrically opposed inlet nozzles, recirculate through grooves on the side of the mixing piston when the head is closed, and the mixing chamber is cleaned by a retractable piston.   The discharge chamber is larger than the mixing head.

The Upjohn '299 Patent need not, however, be operated solely with the L-shape configuration.   The Patent summary states, "The second mixing head can also be removed so that use of the first mixing head in accordance with conventional methods becomes possible."   DX 215, col. 2, lines 66–69.   The device's structure entails attaching perpendicularly two straight-line mixing heads.   In creating the polyurethane foam, the initial impingement of the components occurs in a separate mixing chamber to prevent interference in that process by the introduction of the propellant.   Tr. 754; DX 215, col. 1, lines 37–52.

**10.**   Independent claims 1 and 5 of the Upjohn '299 Patent state:

1.   In a frothing method for mixing a liquid propellant having a low boiling point with further components for production of foamed material, the steps which comprise

separately injecting said further components under high pressure into a first cylindrical mixing chamber closed at one end and open at the other, to produce a first-stage, reactive mix in said first chamber;

advancing said first-stage mix through the open end of said first chamber to a second cylindrical mixing chamber, larger than the first and intersected by the first at the open end of the latter, said second chamber being closed at an axial end adjacent said intersection but open at its opposite axial end;

introducing said liquified propellant into said first-stage mix through a part in said second chamber at said intersection of said chambers, whereby to provide a second-stage mix in said second chamber; and

then discharging said second-stage mix from said open end of said second chamber to allow said mix to expand and form said foamed material.

\*      \*      \*      \*      \*      \*

5.   In a high pressure mixing head for producing a foamed material by mixing a liquified propellant having a low boiling point with further components for the production of said foamed material, said mixing head comprising in combination

a first cylindrical mixing chamber closed at one end and open at the other, and ports opening into said chamber intermediate its axial ends, said ports respectively allowing injection therethrough into said chamber of said further components to produce a first-stage mix;

piston means for controlling the injection of said further components through said ports and for advancing said first-stage mix out of said open end of said first chamber;

a second cylindrical mixing chamber, closed at one end and open at the other, said second chamber being larger than the first and disposed with its axis intersecting the axis of said first chamber intermediate the axial extent of said second chamber to receive said first-stage mix;

port means opening into said second chamber adjacent said intersection of said chambers, and means for introducing said liquified propellant through said port means in countercurrent flow relation to said first-stage mix to produce a second-stage mix;

piston means for advancing said second-stage mix through said second chamber and out the open end thereof, said means also acting to interrupt introduction of liquified propellant at said second chamber port means during discharge of said second-stage mix from said second chamber.

DX 215.

**11.**   Frothing of polyurethane involves injecting a third component outside the mixing chamber that mixes with the chemical flow at a point after the initial impingement of the components.   The third component is a liquid propellant with a low boiling point, i.e., a liquid gas, with the additional propellant being evaporated after it reaches and mixes with the polyurethane flow.   The final product is foamed polyurethane, where the liquid expands quite rapidly due to the added component in the mold.   Direct injection of the frothing or foaming agent in the mixing chamber is not possible because, as the Upjohn '299 Patent points out, the addition of the propellant "leads to an almost explosive expansion" of the flow.   DX 225, col. 1, lines 41–41; *see* Tr. 354. The Upjohn '299 Patent figure is at Appendix 2.

**1414**

The Schneider '874 Patent, entitled "High Pressure Mixing Head for Multi-Component Plastics, Particularly Polyurethane," was not cited to the Examiner. The Patent, granted to Mr. Fritz Schneider, presently employed by KMAG, teaches attaching two or three conventional straight-line mixing heads to a central discharge chamber. DX 164. The mixing chambers, positioned at 180° or 120° angles, depending on whether two or three heads are attached, deposit the polyurethane fluid into the discharge chamber in order to create a laminar flow prior to injection into the mold. DX 164, col. 1, lines 46–54. Recirculation grooves, diametrically opposed component inlet nozzles, and a piston to clean the chamber after the shot are also provided. According to Claim 1, the discharge chamber diameter is "significantly greater than the diameter of the mixing chambers...."[12]

The Court must consider the uncited prior art together with the relevant citations considered by the Examiner, the '128 and '515 Patents, in determining the scope of the prior art. The '128 Patent, reviewed extensively by the Examiner, discloses an L-shape configuration with two straight-line heads attached at a 90° angle. The discharge chamber, as disclosed in Claim 1 of the '128 Patent, has a "cross-sectional area equal to that of said mixing chamber and a width greater than that of the inlet opening into it from said mixing chamber...." DX 9, col. 4, lines 39–42. Claims 4 and 5 of the Patent provide for either circular or rectangular discharge chambers. If the cross-sectional area of circular chambers is equal, then the width of the "inlet opening" from the mixing to the discharge chambers cannot be different, as Claim 1 requires. The content of the '128 Patent regarding the relative sizes of the two chambers is subject to conflicting interpretations. *See infra,* text at 1450–1453. The Patent also provides for recirculation grooves, diametrically opposed component inlet nozzles, and pistons to clean the chambers. The operation, as described in the specifications, is for a batch process, where the fluid fills the mixing chamber before the discharge chamber piston retracts to permit the fluid to fill the mold.[13] DX 9, col. 4, lines 1–23. The Patent is not, however, necessarily limited to the batch operation as nothing in the Claims prohibits fluid communication between the mixing and discharge chambers during operation.

The '515 Patent discloses the recirculation grooves designed to deflect the components back into the external pumps when the piston is closed. The patent exhibits a straight-line mixing head, insofar as the claims are phrased in the singular tense concerning the "control slide" (i.e., piston) and "mixing chamber." In describing the

---

12. Independent Claim 1 of the Schneider '874 Patent states:

    1. A high pressure mixing and injection apparatus from which mixed multi-component plastics, particularly polyurethane, may be discharged in a stabilized jet, said apparatus including a plurality of mixing assemblies each having a cylindrical mixing chamber with in-feed and return flow port means for the several components and also having piston means slidable in the mixing chamber for controlling the flow of the components and to alternately open the port means to allow mixing of the components in the chamber and close the port means to component flow transversely across the mixing chamber while connecting in-flow and return flow port means for each component, the mixing chambers of the mixing assemblies having outlet ports, a transfer cylinder with a diameter significantly greater than the diameter of the mixing chambers, the outlet ports of the mixing chambers communicating with the trans-

fer cylinder for unobstructed flow, an ejector piston slidably disposed in said transfer cylinder, the axes of said cylindrical mixing chambers and the piston means therein extending perpendicularly of and radially toward the axis of the transfer cylinder and said axes also being symmetrically arranged with respect to each other and in a common plane disposed with respect to the transfer cylinder so that the angles between the adjacent axes of the mixing chambers and piston means of the several mixing assemblies are of substantially equal size, and the transfer cylinder having an open end from which flow of the mixed multi-component plastics is discharged in stable jets.

DX 164.

13. A batch process requires the volume of the mixing chamber be at least sufficient to fill the product mold. The speed with which polymerization occurs does not generally permit additional polyurethane to be added at a later time, even less than one minute, to fill the mold.

flow of components, Claim 1 states, "... a control slide shiftable along said chamber for simultaneously regulating the flow of said components from said inlet ports into said chamber and out of said chamber into said [mold] cavity...." DX 8, col. 8, lines 48–52. The obvious teaching of the patent, especially when read in light of the specifications and accompanying drawings, is a single chamber for mixing and discharging the polyurethane.[14] The '515 Patent has diametrically opposed component inlet nozzles, and the "control slide" performs a cleaning function. DX 8, Claim 3.

### 2. Differences Between the Prior Art and the Patented Invention

In comparing the '335 Patent with the prior art, two principles guide the analysis: first, the invention *as a whole* must be considered, and not simply its constituent parts as related to previous patents. *Vandenberg v. Dairy Equipment Co.*, 740 F.2d 1560, 1566 (Fed.Cir.1984); *see Akzo N.V. v. United States International Trade Commission*, 808 F.2d at 1481 (party challenging validity "cannot pick and choose among individual parts of assorted prior art references" to prove obviousness). *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed.Cir.1984) (the differences from the prior art are not what make a device patentable). Second, as the Court of Appeals for the Federal Circuit stated,

> [v]irtually all inventions are necessarily combinations of old elements. The notion, therefore, that combination claims can be declared invalid merely upon finding similar elements in separate prior patents would necessarily destroy virtually all patents and cannot be the law under the statute, § 103.

*Panduit Corp.*, 810 F.2d at 1575 (footnotes omitted). The task of distinguishing a patented device from the prior art is difficult because cases have upheld patents combining elements from the prior art while others have been found obvious when no prior art reference specifically disclosed the claimed invention. *Panduit Corp.*, 774

F.2d at 1094; *compare Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1556 (Fed.Cir.1985) (nonobvious) *with Orthopedic Equipment v. United States*, 702 F.2d 1005, 1013 (Fed.Cir.1983) (obvious).

The review of the prior art demonstrates common features among all L-shape mixing heads regardless of the configuration. First, the '515 Patent's recirculation grooves have set the pattern for succeeding high-pressure mixing head devices. Second, the length of the "control slide" effectively dictates the location of the inlet nozzles, which are diametrically opposed in order to effectuate the mixing. Third, any chambers in the device for mixing or discharging polyurethane will be cleaned by a piston designed to expel residual material before the next operation. Fourth, three prior art references disclose an L-shape with separate mixing and discharge chambers, although the Schneider '874 Patent can also accommodate a triaxial configuration. Fifth, the Upjohn '299 Patent shows fluid communication between the chambers, and the '128 Patent's claims do not prohibit continuous mixing and ejecting of polyurethane instead of a batch process. Sixth, the different diameters of the mixing and discharge chambers, the latter given a larger size in order to ease the transition to a laminar flow, have been specifically incorporated into the Schneider '874 Patent and Upjohn '299 Patent. The contradictory language concerning chamber sizes in Claim 1 of the '128 Patent does not, however, teach a design where the discharge chamber is larger than the mixing chamber.[15]

The teachings of the prior art patents are relevant in determining whether the '335 Patent is obvious. The '515 Patent teaches a straight-line mixing head. The Claims, specifications, and drawings exhibit a device with a single chamber for mixing and injecting the polyurethane. The Upjohn '299 Patent discloses an L-shape head with fluid communication between the mixing and discharge chamber during operation. The patent's primary teaching, however, is directed to "frothing." The Up-

---

14. *See infra,* text at 1455.

15. *See infra,* text at 1453.

john '299 Patent's Claim 1 covers a "frothing method for mixing a liquid propellant having a low boiling point with further components for *production of foamed material....*" DX 215, col. 4, lines 60–62 (emphasis added). The Patent uses the perpendicular discharge chamber to introduce the propellant at a point after the components have been mixed. It is not designed to effect additional mixing except by way of the propellant. The Upjohn '299 Patent, therefore, does not teach the L-shape as a means for better mixing or elimination of the transient phenomenon by use of a lighter piston with a short stroke.[16] The Schneider '874 Patent teaches attaching two or three separate heads that perform the mixing function independently before the flows are combined in a single discharge chamber. The '128 Patent comes closest to the '335 Patent in disclosing an L-shape device. The Patent's principles are fairly simple, in that two straight-line mixing heads are joined at a 90° angle in order to better mix the polyurethane before it enters the mold.

The key question is whether the location of the inlet nozzles and the short mixing chamber in the '335 Patent are true distinctions from the prior art. *See* Tr. 1778. Claim 1 of the '335 Patent states the inlet nozzles "open into said mixing chamber *close* to said exit port means," while Claim 6 states the inlet nozzles are "positioned *in close proximity* to said duct inlet so that mixing action initiated in said mixing chamber *continues in said discharge duct.*" (Emphasis added). By locating the inlet nozzles "close" to the discharge duct, thereby limiting the length of the mixing chamber, two important improvements over the prior mixing heads occur: first, the piston's stroke and size are reduced, lessening the transient phenomenon. Second, the turbulent flow in the mixing chamber, caused in part by the small diameter of that chamber, continues as the polyurethane rebounds off the far wall of the discharge chamber because there is residual kinetic energy in the flow from the initial

impingement. Additional mixing occurs at the top of the discharge chamber because of the L-shape design, while the chamber's greater diameter permits a rapid dampening of the turbulent flow. PX 1, col. 4, lines 29–45.

Powerful testimony at trial on the effect of the short mixing chamber and placement of the inlet nozzles a short distance from the discharge chamber came from Mr. Fritz Schneider, an employee of both KMC and KMAG. Mr. Schneider, who holds two patents for high-pressure mixing heads, has been intimately involved in polyurethane equipment manufacturing at least since 1971, in both design and marketing capacities. Tr. 1309–11. On cross-examination, the following exchange took place:

Q. Okay.

Isn't it a fact that Afros '335 patented mixing head has important advantages which are in no way obtainable with a Krauss-Maffei straight-line mixing head?

A. In free pour applications, in most cases, yes.

Q. And also in the advantage—in the ability to be used in a closed mold without an after mixer. Isn't that a significant advantage as well?

A. There are cases where it's an advantage to have an L-shaped head, whether it's Krauss-Maffei or Afros.

Q. Even when you have got a closed mold?

A. Yes.

Tr. 1412. At the end of his testimony, the Court questioned Mr. Schneider further about the possible advantages of the '335 Patent's short mixing chamber:

THE COURT: You said as I recall, I'm paraphrasing you, that the principle of the turbulence was the same in the middle figure as in the lower figure? [*See infra*, note 27, for figures.]

THE WITNESS: Yes, the principle is the same.

THE COURT: And that it [the location of the inlet nozzles] is commonly known?

---

**16.** The '335 Patent permits introduction of a frothing agent through a port in the discharge chamber opposite the mixing chamber. The

Patent's teaching, however, is quite different from the Upjohn '299 Patent, which focuses exclusively on the frothing method.

THE WITNESS: Yes.

THE COURT: If it was so commonly known, do you know why people weren't using the shorter mixing chamber and having it [inlet nozzles] close to the discharge cylinder?

THE WITNESS: That is a very good question. It was at the time RIM machines were being developed. *I would say hundreds of people were working on the same problems on the same principles.* That is very often said afterwards, *you wonder why people don't come up earlier on simple solutions.* It is much more difficult to find a simple solution for a problem than a difficult one. You know, you mentioned, for example, the Baumgarten patent. You wonder, people were working on the same problem, very, very complicated. This is more discussion. I'm sorry. Maybe I shouldn't do that.

Tr. 1469–1469A (emphasis added).

Mr. Schneider's testimony is both highly revealing and exceptionally credible on the advantages of the '335 Patent over previous mixing heads because he sought to overcome the same problems. The mixing chamber design, incorporating a short mixing chamber with the inlet nozzles located close to the discharge chamber, allows for use in open pour molds, which prior straightline mixing heads generally did not. This achievement was relatively simple, in hindsight, but as Mr. Schneider points out, simple solutions are often hard to discover. This evidence is probative of the differences between the prior art and the claimed invention.

The expert testimony concerning the length of the mixing chamber in an L-shape head is in some agreement concerning the optimum length of a mixing chamber and location of the inlet nozzles. Plaintiff's expert, Dr. Charles Garris, stated that the turbulent flow will diminish dramatically within two diameters of the point of impingement. Tr. 758. Dr. Macosko, defendant's expert, stated a length-diameter ratio in the mixing chamber of less than one

would prohibit the establishment of a laminar flow within the mixing chamber. Tr. 1591. He stated the turbulent flow will last between one and five diameters, depending on the velocity of the flow. Tr. 1592. Both experts agree that the movement around the 90° bend in the chambers will effect some additional mixing in the polyurethane flow, although the degree of mixing will vary depending on whether the flow is turbulent or laminar at that point.

None of the prior art patents disclose a particular location for the inlet nozzles or the preferred length of the mixing chamber. Tr. 1403–1404.[17] Reference to the patent drawings shows the length-diameter ratio for the '128 Patent as 3.8:1, and for the Upjohn '299 Patent as 7.3:1; the '335 Patent drawings show a .5:1 ratio. Although patent figures are not necessarily drawn to scale and are for illustration purposes, they are helpful in this case in determining whether the prior art included the specific location of the inlet nozzles within its teaching. The Court concludes that the prior art does not relate the location of the inlet nozzles, as "close" to the discharge chamber, to the effect on mixing achieved in the discharge chamber.

### 3. Ordinary Skill in the Art

In *Environmental Designs, Ltd. v. Union Oil Co.,* 713 F.2d 693 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984), the Court of Appeals for the Federal Circuit listed the factors to be considered in ascertaining the hypothetical ordinary level of skill in the art:

1) the educational level of the inventor;

2) type of problems encountered in the art;

3) prior art solutions to those problems;

4) rapidity with which innovations are made;

5) sophistication of the technology; and

6) educational level of active workers in the field.

*Id.* at 696. The Circuit Court noted that some factors may predominate in relation

---

**17.** Mr. Schneider, the Manager of KMC's Reaction Injection Molding Division, conceded

the '128 Patent does not specify the inlet nozzles' distance from the discharge chamber. Tr. 1398.

to a particular field. *Id.* at 696–97. The finding on ordinary skill in the art protects the integrity of the law of patents by focusing the Court's attention away from a hindsight analysis and toward the state of the art prior to the issuance of the patent. "[A] person of ordinary skill in the art is also presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate...." *Standard Oil Co. v. American Cyanamid Co.,* 774 F.2d 448, 455 (Fed.Cir. 1985).

The developmental period for high-pressure mixing heads, specifically from the straight-line to the L-shape design of the '335 Patent, was roughly 1970 to 1977. The ordinary skill in the art did not change in any significant manner throughout this period. Tr. 566–67. Plaintiff's expert, Dr. Jack Buist, stated the hypothetical person of ordinary skill would be a composite of a team. Tr. 567–68. The person would have a bachelor of science degree in mechanical engineering, some background in chemistry, and experience in the polyurethane manufacturing industry. Tr. 568–69. In addition, a member of the team that forms the composite would be a technician with expertise in engineering design. Tr. 568–69. Dr. Buist also testified the person would not have experience or training in fluid dynamics. Tr. 566. Dr. Macosko testified the person of ordinary skill would be aware of the '515 Patent's teaching, have a bachelor of science in mechanical engineering with five years experience in mechanical design, and an understanding of fluid dynamics. Tr. 1701–1702.

The problems facing the polyurethane industry in the relevant period involved questions of both mechanical design and fluid dynamics. The transient phenomenon presented difficulties in designing mixing heads, while the need to combine well-mixed polyurethane delivered in a splash-free pour presented fluid dynamics problems. The Court finds that, in addition to the consensus between the experts that a person skilled in the art would have a bachelor of science in mechanical engineering with experience in mechanical design, the level of ordinary skill included some level of knowledge and experience in fluid dynamics. The trend toward L-shape devices and the speed with which those developments occurred demonstrates the need for an ordinary person skilled in the art to possess some understanding of fluid dynamics if they were to participate in the field. The skill level was not great, but at minimum the person had a working knowledge of the effect of a particular design on the mixing and flow of polyurethane through the mixing head and into a mold.

### 4. Secondary Evidence

The so-called "secondary considerations" identified in *John Deere* are of primary importance in determining obviousness, and the Court must always consider any external "real world" evidence that relates to the patent. *Cable Electric Products, Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1026 (Fed.Cir.1985); *Vandenberg,* 740 F.2d at 1567; *see Stratoflex, Inc.,* 713 F.2d at 1538 (secondary considerations may be most probative and cogent evidence of nonobviousness). The question of what weight the evidence is entitled to depends "on its nature and its relationship to the merits of the invention." *W.L. Gore & Associates v. Garlock, Inc.,* 721 F.2d 1540, 1555 (Fed.Cir. 1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

Plaintiff presented evidence of the commercial success of its FPL heads as an indicia of the nonobviousness of the '335 Patent. "Commercial success is, of course, a strong factor favoring nonobviousness." *Akzo N.V. v. United States International Trade Commission,* 808 F.2d at 1481. In considering whether a patent has achieved commercial success, the Court of Appeals for the Federal Circuit has instructed that "[a] nexus is required between the merits of the claimed invention and the evidence offered, if that evidence is to be given substantial weight en route to a conclusion on the obviousness issue." *Stratoflex,* 713 F.2d at 1539. Defendant argues plaintiff's raw sales figures do not establish the nexus between the patent and any inference of commercial success, and that plaintiff fails to place those figures in the context of

overall market share from which meaningful inferences can be drawn.

Plaintiff introduced figures for the years 1977 through 1986 for its worldwide unit sales of both straight-line and FPL mixing heads.[18] Plaintiff also broke down the sales for the United States through Cannon, U.S.A., Inc. ("Cannon"), its exclusive American distributor. PX 31, 32. Annual worldwide FPL sales went from zero to 211 in the first three years, almost doubling each year. In the period 1980–84, total sales were well over 200 per year, and reached 356 and 362 in 1985–86. During the same period, worldwide sales of Afros straight-line mixing heads declined from over 200 in 1977 to 46 in 1985. PX 31. In the United States, where plaintiff's evidence is for the period 1978–86, unit sales show a similar but less dramatic growth, reaching 63 in 1986. PX 32.

Afros' sales, both worldwide and in the United States, have been further broken down into those sales only of the mixing head unit, and sales that include the Afros dispensing system. The latter system includes the mixing head, the chemical pumps and tanks, the frame, and other peripherals. Tr. 648–49. The system also includes in some sales the robotics for injecting the polyurethane in form molds automatically. *Id.* According to the testimony of Roy Brooks Hammer, president of Cannon, the overall increase in gross income from FPL sales is attributable in part to the sales of equipment accompanying the mixing head. Tr. 639–40.[19]

Defendant argues that the real basis for Afros' success has been the application of the '515 recirculation grooves in the FPL mixing head. In effect, KMC reiterates its nexus argument, asserting that the FPL head sales are not clearly linked to the invention in the '335 Patent. However, aside from a reference at trial by counsel to that effect, Tr. 643, KMC presented no evidence beyond its unit sales to show the effect of the recirculation grooves on the commercial success issue. Defendant's overall sales of the UL mixing heads since 1981 total 40, as compared to nearly 200 for Afros. *Compare* Pre-Trial Stipulations, Dkt. 127, ¶ 54 *with* PX 32.

Plaintiff's sales data does not, standing alone, establish commercial success because it lacks the requisite nexus to the claimed invention. *Cable Electric Products, Inc.,* 770 F.2d 1015 at 1027; *Vandenberg,* 740 F.2d at 1565. Two additional items do, however, supply the necessary link to permit the Court to consider the devices commercially successful because of the '335 Patent's invention. First, both Dr. Buist and Mr. Hammer testified the polyurethane molded product market has remained static almost throughout the period in which Afros marketed the FPL heads. Tr. 583, 640. The growth in FPL sales exceeds that of the market's demand for polyurethane. Tr. 585. Second, the Afros head has replaced a number of competing heads, and importantly it has been substituted for straight-line heads. Tr. 592. The FPL head's capacity to produce polyurethane molded items that straight-line heads could not, *see* Tr. 590, 636–37, is highly relevant evidence that the commercial success is directly attributable to the '335 Patent, and not the recirculation grooves from

---

**18.** Total North American sales through 1986 for the FPL and UL heads, broken down by model size, are as follows:

| KMC | | AFROS | |
|---|---|---|---|
| MK–6/8–UL–2K | 4 | FPL–10 | 56 |
| MK–8/12–UL–2K | 9 | | |
| MK–8/12–UL–3K | 7 | FPL–14 | 101 |
| MK–12/16–UL–3K | 19 | | |
| MK–12/16–UL–3K | 0 | FPL–18 | 64 |
| MK–16/25–UL–2K | 0 | | |
| MK–16/25–UL–3K | 1 | FPL–24 | 6 |
| MK–20/36–UL–2K | 0 | | |

Pretrial Order, Dkt. 127, ¶¶ 53–54.

**19.** Mr. Hammer testified Cannon's gross sales of FPL heads and the dispensing system have grown from less than $1 million to nearly $12 million. Tr. 639. Plaintiff failed to break down the figures into those of the FPL heads, and the Court cannot consider peripheral items unrelated to the patented invention in determining commercial success. Statements at trial indicated the FPL heads sell for $8–12,000 each. Total FPL sales since 1978 in the United States are 227, and through November, 1986, were 63. PX 32. In terms of dollar value, 1986 sales would account for between $504,000 and $756,000 of Cannon's total sales. Plaintiff did not

the '515 Patent found in most mixing heads. Defendant did not seek to impeach or rebut plaintiff's testimony on this question, and the Court credits the witnesses' testimony that the FPL heads achieved strong commercial success attributable primarily to the '335 Patent.

■ Mr. Schneider's testimony concerning the '335 Patent's "simple" solution to a persistent industry problem is also powerful objective evidence. *See supra,* text at 1416–1417. A patent responsive to an industry's need, where a number of competitors have sought solutions to the problem without success, supports a finding of nonobviousness. *See Akzo N.V. v. United States International Trade Commission,* 808 F.2d at 1481 (solution to longfelt need immediately recognized by practitioners as "a remarkable advancement" evidence of nonobviousness).

Mr. Schneider's testimony also supports Dr. Fiorentini's statement that his design achieved an unexpected result by both limiting the transient phenomenon and achieving better mixing while a laminar flow was created at the point of injection into the mold. Tr. 188–90. Mr. Schneider, who is clearly well versed in the art, could not explain why the solution to the problem was missed. Moreover, the prior art does not show a short mixing chamber in combination with the inlet nozzles close to the discharge chamber as a viable answer. By locating the inlet nozzles within a relatively short distance from the discharge chamber, the length of the mixing chamber can be reduced because the area to be cleaned after a shot and the stroke of the mixing piston are reduced. The evidence of an unexpected advantage achieved by the '335 Patent is "strong support for a conclusion of nonobviousness." *Lindemann Maschinenfabrik,* 730 F.2d at 1461.

### 5. Conclusion

In its opinion on remand in *Panduit Corp.,* the Court of Appeals for the Federal Circuit made abundantly clear the legal standard for analyzing the issue of obviousness:

To reach a proper conclusion under § 103, the decisionmaker must step backward in time into the shoes worn by the "person [having ordinary skill in the art]" when the invention was unknown and just before it was made. In light of *all* the evidence, the decisionmaker must then determine whether the patent challenger has convincingly established, 35 U.S.C. § 282, that the claimed invention as a whole would have been obvious at *that* time to *that* person. 35 U.S.C. § 103. The answer to that question partakes more of the nature of law than of fact....

810 F.2d at 1566 (emphasis in original). Both the claimed invention and the prior art must be considered as a whole. *Lindemann Maschinenfabrik,* 730 F.2d at 1462; *Hybritech Inc.,* 802 F.2d at 1383 (Fed.Cir. 1986). As the Circuit Court has noted, "Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination." *In re Geiger,* 815 F.2d 686, 688 (Fed.Cir.1987) (citing *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1577 (Fed.Cir.1984)).

■ In reviewing the '335 Patent in light of the prior art, the fundamental distinction is the location of the inlet nozzles "close to" and "in close proximity to" the discharge chamber, permitting a design that uses a short mixing chamber. The prior art does not specify the inlet nozzle location, but it does disclose the other major facets of the '335 Patent: recirculation grooves, fluid communication between the mixing and discharge chambers, a discharge chamber with a greater cross-sectional area than the mixing chamber, and the L-shape configuration. None of the prior art, including the '128 Patent, teaches the placement of the inlet nozzles at any particular distance from the discharge chamber, permitting impingement in a short mixing chamber as affecting the component mixing or transition to a laminar flow. On this point, the prior art discloses

submit evidence showing the market share or relative profitability of the FPL heads.

at most a mixing chamber as narrow as possible, considering the volume necessary for production, in order to effectuate component impingement.

The testimony conflicts as to whether a person of ordinary skill in the art would understand whether the L-shape and its relation to the location of the inlet nozzles in permitting use of a short mixing chamber would have an effect on mixing. Mr. Schneider, who holds patents on high-pressure mixing heads and has long experience in the industry, testified the '128 and '335 Patents, because of their L-shape, are based on the same principle and have similar teachings on impingement mixing. Tr. 1449. These statements conflict with his later response that the '335 Patent's solution eluded the industry because of its very simplicity. Tr. 1469. It is incongruous to assert the prior art made obvious an invention while also stating the '335 Patent effected an advance in polyurethane mixing head technology. The Court has previously credited Mr. Schneider's testimony concerning the advantage of the '335 Patent design, and therefore must reject his conflicting testimony on the disclosures of the prior art.

The opinions of the expert witnesses concerning the fluid dynamics of the flow in the mixing heads conflicts as to whether the prior art reveals the claims of the '335 Patent.[20] Dr. Macosko stated the need to create "back pressure" in the mixing chamber can be effected through an L-shape, Tr. 1364, but he did not see any further beneficial effect from the short mixing chamber design and location of the inlet nozzles on mixing in the discharge chamber. Tr. 1585–86. His testimony was based on knowledge of general principles of fluid dynamics and not from experience working with L-shape heads. Plaintiff's expert, Dr. Garris, stated the L-shape configuration, when combined with a short mixing chamber, "effectively utilized" the energy created through placement of the inlet nozzles close to the discharge chamber in the area of impingement to promote better mixing. Tr. 758–59. He noted that when first confronted with the '335 design, he did not know whether the short chamber would aid the component mixing. After performing a visualization test, Dr. Garris saw the effect of the FPL head's design on mixing. Tr. 757–58. Dr. Garris' field of expertise is in fluid dynamics and reading blueprints, not as an expert in polyurethane mixing heads. Tr. 696–97.

Defendant's expert testified that the value of an L-shape design is clearly known, and the length of the mixing chamber is dependent on the volume of the shot, but the configuration does not otherwise affect mixing. Plaintiff's expert states the '335 Patent creates a better mix, and the value of a short mixing chamber through the location of the inlet nozzles had not been revealed prior to the '335 Patent. Both witnesses lack expertise in the polyurethane mixing head industry, which limits the weight of their testimony. They are qualified as experts in fluid dynamics, and the Court has considered their testimony in light of that limitation. Professor Macosko's testimony conflicts with the statements of Mr. Schneider concerning the effect of the location of the inlet nozzles because defendant's expert does not account for the additional mixing caused by the short length of the mixing chamber and placement of the inlet nozzles combined with the L-shape design.

In weighing the experts' testimony on whether the mixing chamber length affects the component mixing, objective evidence from product samples supports Dr. Garris' testimony. Defendant provided product samples from tests it ran comparing the difference between short and long mixing

---

**20.** The plaintiff conducted a series of tests comparing the '335 Patent design with a mixing head conforming to the figures for the '128 Patent, including the long mixing chamber. The tests, which apply a method developed by the Aachen Institute and are known as the "Aachen Test," present a number of evidentiary problems. First, the full results of all tests were not presented in court, and no one person participated in all aspects of the procedure to authenticate the results. Second, the Aachen Test has only recently been developed, and plaintiff failed to lay a proper foundation for its veracity. The Court has not considered the Aachen Test results in reaching its conclusion on the issue of obviousness.

chambers in L-shape heads. DX 197, 199. The product is a steering wheel center. Tr. 1237. One sample came from a mixing head with a chamber length of 13 millimeters, DX 197, the other 62 millimeters. DX 199; Tr. 1236. The short mixing chamber head has a length-diameter ratio of 1.63:1, while the longer has a 7.88:1 ratio. All other conditions were identical. Mr. Guenther Mueller, a KMAG sales engineer, stated, "[t]here is no significant difference concerning the mixing quality of both samples." Tr. 1237. On rebuttal, Mr. Richard Werner, Cannon's Product Development Manager, testified the differences between the products would cause an automotive manufacturer to reject the sample produced from a long mixing chamber head for failure to meet specifications. Tr. 1806. Mr. Werner pointed out two defects: dull spots on the surface and shrinkage around the edges where the polyurethane foam collapsed in. Tr. 1804–05. The Court examined the exhibits closely both during trial and after the completion of post-trial briefing. Tr. 1805A. The examination of the evidence demonstrates the defects pointed out by Mr. Werner in the long mixing chamber sample do not exist in the short mixing chamber sample. In light of this finding and Mr. Werner's testimony and experience in the sales and product service areas of the industry, the Court credits his testimony that the sample produced from the long mixing chamber is defective and would not conform to the automotive industry's standard.

Although defendant conducted the comparison tests to bolster its case that mixing chamber length does not improve mixing, the Court draws the opposite conclusion regarding the efficacy of the short mixing chamber. This evidence, coupled with Mr. Schneider's testimony, is persuasive on the question of which expert to credit. Dr. Macosko's statements do not coincide with the objective evidence, while Dr. Garris' do. Therefore, the Court rejects Dr. Macosko's testimony regarding the effect of the short mixing chamber, and credits Dr. Garris. Consideration of the prior art, expert testimony, and Mr. Schneider's admission leads to a preliminary conclusion that the claimed

invention in the '335 Patent, the location of the inlet nozzles and a short mixing chamber, is not obvious. The analysis, however, does not conclude at this point. "Prior art ... cannot be evaluated in isolation, but must be considered in the light of the secondary considerations bearing on obviousness." *Alco Standard Corp. v. Tennessee Valley Authority*, 808 F.2d 1490, 1499–1500 (Fed.Cir.1986).

The secondary evidence supports a conclusion of nonobviousness. The FPL head's success, both as a response to the industry's need and in its sales, demonstrates the '335 Patent is not obvious under the standards of 35 U.S.C. § 103. Moreover, defendant's burden of overcoming the presumption of validity under § 282 by clear and convincing evidence has not been met by the minimal evidence produced at trial. KMC relies primarily on the language of the prior art patents while never presenting evidence to rebut plaintiff's proof of secondary considerations.

Defendant's argument on obviousness has a superficial appeal if the Court applies a hindsight analysis to whether the prior art revealed the '335 Patent. The law is clear, however, that the standard applied is the ordinary person skilled in the art at the time of the invention. The person of ordinary skill would not have achieved the '335 Patent invention by analyzing the prior art, as demonstrated by a review of that art and the secondary considerations. Under this rubric, the Court holds the '335 Patent was not obvious based on the evidence presented.

## B. Indefiniteness

35 U.S.C. § 112, second paragraph, provides:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Defendant argues Claims 1 and 6 of the '335 Patent are indefinite because they do not specify adequately the location of the inlet nozzles. Claim 1 places the inlet nozzles "close to" the discharge chamber,

while Claim 6 states they should be "in close proximity to" the discharge chamber. PX 1, col. 5, lines 8–9; col. 6, line 21. Defendant alleges the failure to fix the location of the inlet nozzles in dimensional terms makes it impossible to clearly read the size of the mixing chamber, *i.e.*, the length-diameter ratio, into the patent, which renders the claims invalid.

█ Indefiniteness is a question of law, *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed.Cir.), *cert. denied*, 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985), and the party challenging the patent must prove the failure to meet § 112's requirements by clear and convincing evidence. *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575 (Fed.Cir.1986). In reviewing the claims, the Court must determine whether, in light of the specifications, they "reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits...." *Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958) (*cited in Shatterproof Glass*, 758 F.2d at 624). Patents are written for those skilled in the art, not the general public, and are invalid "only when those skilled in the art are required to engage in *undue* experimentation to practice the invention." *W.L. Gore & Associates Inc.*, 721 F.2d at 1556–57. *See Shatterproof Glass*, 758 F.2d at 624 (claim should not be viewed in abstract, but in conjunction with specifications).

The '335 Patent's Summary of the Invention states the arrangement of the mixing and discharge chambers to be such

that the flow of material overflowing out of the mixing chamber knocks against the opposite wall of said discharge duct.... In this way it is possible to limit to a minimum the length of the discharge duct since regular flow is obtained, and consequently the overall dimensions and the weight of the said head can be reduced.

PX 1, col. 2, lines 29–37. The specification describes the operation and states: "... the swirl that remains in the flow of the mixed material ceases in a small amount of space due to the flow being made to deviate and to its knocking against the opposite wall of the discharge duct." PX 1, col. 4, lines 37–41. The specification also describes rapid retraction of the mixing piston, limiting the transient phenomenon, but that design feature is not clearly linked to the location of the inlet nozzles. *See* PX 1, col. 3, lines 37–43.

Testimony at trial indicates the exact location of the inlet nozzles cannot be fixed in absolute terms, and therefore the length of the mixing chamber will vary in heads with mixing chambers of different diameters. Dr. Macosko stated the length of the mixing chamber depends on the flow rate, the size of the product, and the type and cost of the materials used. He testified that, as a starting point, the length of the chamber should not be more than five diameters. Tr. 1597. Dr. Garris stated the turbulent flow "tends to dissipate very rapidly," generally within two diameters of the point of impingement, because of the viscosity of the fluid. Tr. 758. Finally, Mr. Schneider noted that "close" is a relative term. Tr. 1346, 1436. The mixing heads can also include inlet ports for additional components, the most common being injection of a component color. The added component, which must be impinged with the polyol and isocyanate at a point in the mixing chamber, will affect the length of the chamber. *See* Tr. 599. Mr. Schneider also testified the design method used to seal the mixing piston will affect the location of the inlet nozzles and the length of the mixing chamber. Tr. 1461. If sealing grooves are used on the piston, then the area between the inlet nozzles and face of the piston will be greater and the length of the chamber is necessarily made longer. Tr. 1463. The evidence is clear that the location of the inlet nozzles varies within a narrow range, depending on design and product considerations, but always remains close to the discharge chamber.

Although the '335 Patent cannot supply the length of the mixing chamber with

pinpoint accuracy, the term "close" must be analyzed to determine if it is sufficiently specific to meet the requirements of § 112. In *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540 (Fed.Cir.1984), the patent claim used the term "close proximity" without defining it. The Court of Appeals for the Federal Circuit affirmed the District Court's finding that the language was as precise as the subject matter permitted in light of, *inter alia*, the ease with which witnesses used the term and its use in the prior art. *Id.* at 1546–47. This Court found the words "tight" and "tightly" sufficient under § 112 for those of ordinary skill in the art in *Lang v. Prescon*, 545 F.Supp. 933, 946–47 (D.Del.1982). *See also Orthokinetics, Inc.*, 806 F.2d at 1576 (law does not require listing in patent all possible lengths for different products); *Bausch & Lomb, Inc.*, 796 F.2d at 450 ("smooth" not indefinite); *Shatterproof Glass*, 758 F.2d at 624 (failure to specify size of glass, quantity or quality of coating, and term "freely supporting" does not render claim indefinite in light of specifications and ordinary skill in the art).

The claims and specifications of the '335 Patent direct attention to the mixing that occurs at the point of egress from the mixing chamber, where the turbulent flow rebounds off the far wall of the discharge chamber, as dependent on the location of the inlet nozzles "close to" the discharge chamber. In other words, this mixing effect is heightened by the turbulence remaining in the flow caused by the short distance traversed from the point of impingement to striking the wall of the discharge chamber. The turbulence will be rapidly converted to a laminar flow in the discharge chamber while a better mixed product is produced.

The person of ordinary skill in the art, as discussed previously, has knowledge of fluid dynamics. This knowledge, when applied to the claims and specifications, will give content to the terms "close" and "in close proximity to" because the person would know the length of the mixing cham-

ber could not be much greater than two diameters, depending on the volume of the shot and the viscosity of the components, and that the location of the inlet nozzles effectively dictates the length of the mixing chamber. *See Allen Archery, Inc. v. Browning Manufacturing Co.*, 819 F.2d 1087, 1092 (Fed.Cir.1987) (claim language clear in light of specification). The specific location of the inlet nozzle varies, and some experimentation would be necessary to find the best distance in relation to the design of the mixing piston. "Close" is not a definite term in a spatial sense, but the context of the '335 Patent, identifying the additional mixing as the turbulent flow enters the discharge chamber and rebounds off the far wall of that chamber, provides the necessary content to permit one skilled in the art to understand the Claims.[21]

The Court finds the person of ordinary skill in the art would apply the knowledge of fluid dynamics principles, that a turbulent flow would be abated within about two diameters, to the term "close" to determine the range of possible locations for the inlet nozzles and length of the mixing chamber in applying the '335 Patent. *See* Tr. 758. Therefore, "close" means as close as possible in order to effectuate mixing in both chambers, as described in the specification, in light of fluid dynamics principles and the mechanical design expertise of the person of ordinary skill. The range of mixing chamber lengths, based on locating the inlet nozzles close to the discharge chamber, will generally not exceed a length-diameter ratio of 2:1. Therefore, the Court finds the terms "close" and "in close proximity to" in the '335 Patent claims have the requisite specificity and are not indefinite so as to render the Patent invalid under § 112, second paragraph.

## IV. INEQUITABLE CONDUCT

Defendant argues the plaintiff's failure to cite to the Examiner the Upjohn '299

---

21. Defendant did not introduce expert testimony concerning the meaning of "close" and "in close proximity to," instead arguing that the '335 Patent figure is the sole means by which the term can be defined. *See* Defendant's Proposed Findings of Fact, Dkt. 157, ¶ 176.

Patent, which has a priority date of March 26, 1975, constitutes inequitable conduct in the PTO and renders the '335 Patent unenforceable. Although the inequitable conduct or "fraud in the PTO" defense is often "overplayed" in patent litigation, *see Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1454 (Fed.Cir.1984), KMC raises a substantial question regarding Dr. Fiorentini's failure to cite the Upjohn '299 Patent during the lengthy prosecution of his patent. Plaintiff does not deny having knowledge of the Upjohn '299 Patent, but argues it is merely cumulative of the relevant prior art cited in the application, specifically the '128 Patent.

"A party asserting the defense of [inequitable conduct] bears a heavy burden of proof which must be met by clear and convincing evidence." *Environmental Designs,* 713 F.2d at 698. In *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553 (Fed. Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985), the Court of Appeals for the Federal Circuit set out the two elements necessary to establish inequitable conduct: "materiality of the nondisclosed or false information" and "proof of a threshold intent." *Id.* at 1559–60. "Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred." *Id.*

The proper standard for determining whether prior art is material "is whether a reasonable examiner would consider the omission or misrepresentation important in deciding whether to issue the patent." *Akzo N.V. v. United States International Trade Commission,* 808 F.2d at 1481. *Cf.* PTO Rule 1.56(a), 37 C.F.R. 1.56 (1982). To be material, the prior art need not rise to the level of proving anticipation under § 102 or obviousness under § 103. *See A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 1397–98 (Fed.Cir.1986) ("test for materiality is not whether there is anticipation or obviousness"). If prior art had to meet that higher threshold, then the inequitable conduct defense would be subsumed under the substantive analysis of § 102 or § 103 because a challenger's proof on those issues would necessarily encompass the inequitable conduct defense.[22]

The requisite intent "need not be proven by direct evidence or by proof of deliberate scheming." *In re Jerabek,* 789 F.2d 886, 891 (Fed.Cir.1986). Intent may be inferred from the knowledge of the applicant of the materiality of the prior art, *A.B. Dick Co.,* 798 F.2d at 1398, or gross negligence may suffice if the applicant or patent counsel "should have known" the reference would be material to the Examiner. *Id.; Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984). Although subjective good faith can diminish the degree of actual intent, at its core the test is objective, *i.e.,* "whether a reasonable person ... knew or *should have known* that the information was material." *Argus Chemical v.*

---

**22.** Plaintiff argues the Court's previous determination of non-obviousness should govern whether the Upjohn '299 Patent is material prior art for the '335 Patent. The Court of Appeals for the Federal Circuit has stated that if a reference "neither anticipates nor renders obvious" a patent, "the necessary threshold showing of materiality has not been made." *Laitram Corp. v. Cambridge Wire Cloth Co.,* 785 F.2d 292, 295 (Fed.Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 85, 93 L.Ed.2d 39 (1986); *see Carella v. Starlight Archery & Pro Line Co.,* 804 F.2d 135, 140 (Fed. Cir.1986) (no inequitable conduct where reference does not anticipate or make obvious the patent in suit). In both *Laitram Corp.* and *Carella,* the Federal Circuit affirmed the district court's finding of no inequitable conduct. The cases do not, however, stand for the proposition that uncited prior art which does not make a patent obvious or anticipated automatically means it need not have been cited to the Examiner. They must be understood in the overall context of the Federal Circuit's affirmance of the district courts' findings on inequitable conduct. The standards for anticipation, obviousness, and inequitable conduct overlap to a degree, and findings on one issue may apply to the others. But that does not mean the standards are identical, and the Court does not understand the Federal Circuit to have merged inequitable conduct into the § 102 and § 103 analyses. *See Gardco Manufacturing, Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1214 (Fed.Cir.1987) ("In determining the inequitable conduct issue, a district court need not make explicit findings on whether undisclosed art anticipates the claimed invention or whether it would have rendered the claimed invention obvious under 35 U.S.C. § 103....").

*Fibre Glass-Evercoat Co.*, 759 F.2d 10, 14–15 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985)

Materiality and intent are necessarily determinations of degree, thereby requiring the Court to balance them. As the Court of Appeals for the Federal Circuit noted in *N.V. Akzo v. E.I. DuPont de Nemours & Co.*, 810 F.2d 1148 (Fed.Cir.1987),

... the less material the proffered or withheld information, the greater the degree of intent that must be proven. In contrast, a less degree of intent must be proven when the information has a great degree of materiality. Indeed, gross negligence can be the intended level of intent when the misrepresentation has a high degree of materiality. Simple negligence, however, or an error in judgment is never sufficient for a holding of inequitable conduct.

*Id.* at 1153; *see Austin Powder Co. v. Atlas Powder Co.*, 593 F.Supp. 208, 212 (D.Del.1984) (intent and materiality fall on a continuum).

### A. Materiality

Dr. Fiorentini testified the Upjohn '299 Patent is part of the family of prior art L-shape devices, along with the '128 and Schneider '874 Patents.[23] Tr. 1718. The Upjohn '299 Patent's degree of materiality cannot, however, rest solely on its L-shape configuration because the '128 Patent cited to the Examiner fully discloses that design. Indeed, the file wrapper of the '335 Patent shows the Examiner's primary problem with the patentability of Dr. Fiorentini's device was that the '128 Patent anticipated and made obvious his invention. The question of the Upjohn '299 Patent's materiality must be determined by reviewing the '335 Patent prosecution history to ascertain the degree of relevance of the Upjohn '299 Patent for the Examiner in reviewing the '335 Patent Claims.

### 1. '335 Patent's Prosecution History

In the original patent application, filed November 17, 1978, Claim 1 stated:

1) A head for mixing and ejecting interacting liquid components, for molding articles made of plastic material, comprising in combination: a body defining a mixing chamber for the components which communicates with a discharge duct, and at least a first and a second infeed duct for the individual components provided with outlet orifices that open into the said mixing chamber, the latter being placed laterally with respect to the discharge duct and forming an angle with the axis thereof.

DX 226 at 15. Plaintiff submitted a Preliminary Amendment to its application on March 29, 1979, adding a new claim 6. The claim stated, "A head according to claim 1, in which said mixing chamber and said discharge duct are axially extending, and in which said mixing chamber, in a plane perpendicular to its axis, has a cross-sectional area different from a corresponding cross[-]sectional area of said discharge duct." DX 226 at 39. The Examiner rejected claims 1 and 6 on the basis that defendant's '128 Patent anticipated the invention. The Examiner stated, "It is noted that [the '128 Patent] discloses the filling of the mold with reactive components, such as used in the forming of polyurethane bodies. (column 1, Field of the Invention) [claim 1]." DX 226 at 41.

Plaintiff amended the application on December 7, 1978, adding new Claims 8 and 9 and rewriting Claim 1 as follows:

1. (amended) A head for *continuously* mixing and ejecting interacting liquid components[,] *into a mold* for molding articles made of plastic material, comprising in combination: a body defining a mixing chamber for the components [which communicates with], a discharge duct *communicating with said mixing chamber*, and at least a first and a second infeed duct for [the] individual components provided with outlet orifices that open into [the] said mixing chamber, [the latter being placed laterally with respect to the discharge duct and] *said mixing*

---

**23.** Defendant admits plaintiff had no knowledge of the Schneider '874 Patent during the prosecu-

tion, and does not argue the failure to cite it constitutes inequitable conduct.

*chamber* forming an angle with [the axis thereof] *and having a length shorter than said discharge duct.*

DX 226 at 45–46 (Emphasis added). Dr. Fiorentini distinguished the '128 Patent, which had been the primary basis for the rejection, on the basis that his device required continuous mixing and injecting of the components when the head was open.[24]

On May 16, 1980, the Examiner rejected the claims under § 103, stating the '128 Patent discloses a system for continuous fluid communication between the chambers, and the claim for mixing chamber length is "a matter of choice or design which would be obvious...." DX 226, at 56.[25] An amendment, submitted August 18, 1980, added language regarding the location of the inlet nozzles "in close proximity to" the discharge chamber. Dr. Fiorentini also appealed the Examiner's rejection, arguing

> There is no teaching or suggestion in the ['128 Patent] of the mixing and quieting chambers being in fluid communication with each other during the period in which materials are added to the mixing chamber. Clearly, the reference teaches a batch feeding operation, not a continuous feeding operation of the type provided by the present invention.

DX 226, at 63. Plaintiff also noted the '128 Patent does not teach the shorter mixing chamber and location of the inlet nozzles.[26]

---

**24.** The Remarks explaining the amendment state:

> Considering now U.S. Patent No. 3,975,128, the primary reference relied on by the Examiner, this patent describes a mixing apparatus for discontinuous or batch mixing and injecting mixed components into a mold. During a mixing step, piston 2 is retracted while piston 16 is in an advanced position. At the end of the mixing step, piston 16 is retracted, while piston 2 is advanced to feed mixed material into a quieting chamber 12. Thereafter, the piston 16 is advanced again to press the material into the mold. The molding operation of the apparatus is made step-by-step, so as to fill the mold.
>
> Owing to the above, the length of the volume of mixing chamber 1 must be substantially equal to the length and volume of chamber 12.
>
> On the contrary, the present invention provides a mixing and injecting device in which the mixing and the feeding operations of material to fill the mold are continuous. This involves different problems, as set forth in the specification. Of great importance (see page 1407, last paragraph and following page 1406) is the necessity to control the mixing at the beginning of the operation and to reduce the duration of transient phenomena which may alter the stoichiometric relation between the components.
>
> To this end, the present invention provides a mixing head having a short mixing chamber with a length shorter than the discharge channel, i.e., the mixing chamber has a volume smaller than the discharge channel. Angular disposition of the mixing chamber allows reducing its diameter, so as to further improve the mixing effect. During the operation, plug valve 15 and cleaning plug 4 are retracted to allow the mixed material to flow continuously into the mold.
>
> The shortening of the mixing chamber allows the reduction of the stroke of piston 16 and consequently the reduction of the overall-dimension of the head.
>
> It is respectfully submitted that independent claims 1 and 9 define subject matter that is patentable in view of [the '128 Patent]. Accordingly, allowance of these claims is respectfully requested.

DX 226 at 49–50.

**25.** The Examiner's Statement recited the basis for the rejection as follows:

> 1–Claims 1, 2, 6 and 7 are rejected under 35 U.S.C. 103 as being unpatentable over Schluter ['128 Patent]. Schluter discloses a system for continuously mixing and ejecting liquid components into a mold 26 comprising a body defining a mixing chamber 1, a discharge duct 20, a first 9 and a second 8 infeed duct, a first 11 and a second 10 recycling duct, a recycling valve 3 having recesses 21, 22 which allow fluid communication between the infeed ducts and the recycling ducts. The provision of a mixing chamber having a length shorter than said discharge duct is deemed to be a matter of choice or design which would be obvious to a person having ordinary skill in the art.

**26.** In extensive remarks to the Examiner, Dr. Fiorentini attempted to distinguish the '128 Patent, called the "Schluter Patent," as follows:

> Considering now the outstanding Office Action, claims 1, 2, 6 and 7 have been rejected under 35 U.S.C. § 103 "as being unpatentable over Schluter". According to the Examiner, "Schluter discloses a system for continuously mixing and ejecting liquid components into a mold 26". This interpretation of the teachings of Schluter is respectfully traversed. It is submitted that the reference describes a batch processing operation, not a continuous feeding system. As noted on lines 15 to 19 of column 2 of the reference, "the system ac-

The application then suffered yet another rejection. DX 226, at 67.

After filing a Patent Continuation in September, 1980, DX 225, at 21, the Examiner rejected the Claims as obvious under the '128 Patent, DX 225 at 33, specifically referring to the size of the discharge and mixing chambers. On May 7, 1981, plaintiff's patent counsel met with the Examiner and provided a set of drawings, *reprinted below* in footnote 27, to distinguish Dr. Fiorentini's application from the '515 and '128 Patents.[27] He agreed to amend

cording to the present invention [Schluter] is advantageous in that the reaction takes place completely within the mixing chamber and thereafter the well mixed components are ejected as a body into the mold cavity." Further, as noted in the paragraph beginning on line 1 of column 4, the piston 16 (which is similar to the cleaning member used with the present invention) blocks fluid communication between the mixing chamber 1 and the quieting chamber 12 while materials are introduced into and mixed within the chamber 1. After the materials have been mixed, the piston 16 is retracted and the pistion [sic] 1 is advanced to empty material mixed in chamber 1 into the chamber 12. The piston 16 is then advanced to both interrupt fluid communication between the chambers 1 and 12 and to empty the contents of chamber 12 into the mold 26. There is no teaching or suggestion in the reference of the mixing and quieting chambers being in fluid communication with each other during the period in which materials are added to the mixing chamber. Clearly, the reference teaches a batch feeding operation, not a continuous feeding operation of the type provided by the present invention.

According to the Examiner, the provision in Schluter of a mixing chamber having a length shorter than the discharge duct would be obvious to a person having ordinary skill in the art. To support his position, the Examiner has cited column 2, lines 48–53 of Schluter. On page 3 of the Official Action, the Examiner has relied erroneously only on the contents of lines 49–53 of Schluter and has not mentioned line 48. On line 48, Schluter specifies that the *cross-sectional area* of the quieting chamber is at least the same size as that of the mixing chamber. No comment is made on the lengths of the chamber. In fact, at column 3, lines 63–67, it is stated that "In all cases *the strokes of the two pistons* 16 and 3 *are the same* [emphasis added]", that is, the chambers have the same length, and "their cross-sectional areas are the same so that the volumes displaced by them on reciprocation from one end position to the other are equal" (column 3, lines 64 to 67).

Furthermore, in Schluter, inlets 8 and 9 of components into mixing chamber 1 are spaced from the mixing chamber output 5 by the length of stroke of piston 3, so as to have the volume of the mixing chamber equal to the volume of the workpiece in the mold 26.

On the contrary, in the invention recited in rewritten claim 9, inlets 7 and 8 are positioned in close proximity to the exit port 2' so as to have the stroke of piston 15 independent from the position of inlets 7 and 8 and the volume of mixing chamber 1 independent from the volume of the workpiece to be molded.

In Schluter, the mixing and the reaction of chemical components (column 4, lines 5) take place in the mixing chamber when the mixing chamber is closed by piston 16. Thus, the reference relates to batch feeding. Therefore, in Schluter, workpieces having volumes larger than the volume of the mixing chamber cannot be molded.

On the contrary, in Fiorentini application, during mixing, the chamber 2 is opened to channel 3 and to the mold; therefore, the mixing takes place in both chamber 2 and channel 3, with the reaction taking place in the mold. Furthermore, the volume of workpieces may be greater than the combined volumes of chamber 1 and channel 3.

Since claimed features of the invention, such as the positioning of the infeeding ducts, are neither taught nor suggested by the reference, it is respectfully submitted that the claims define subject matter that is non-obvious in view of Schluter.

DX 226, 62–64

27. The top drawing exhibits the '515 Patent, the middle is plaintiff's representation of the '128 Patent, and the bottom is its proposed patent. Dr. Fiorentini sought to demonstrate a distinguishing aspect over the '128 Patent by showing additional mixing in the discharge chamber, exhibited by the broken lines.

DX 225, at 39.

Plaintiff explained the drawings to the examiner as follows:

During the aforementioned interview, a sheet of drawings, a copy of which is attached as Appendix B, was given to the Examiner to demonstrate differences between the present invention and the prior art. The sketch at the top of Appendix B is based on the disclosure in attached Reference AL. The middle figure is based on the disclosure in Reference A. The last figure illustrates the presently claimed invention.

Referring now to the top figure in Appendix B, it illustrates a device in which a mixing chamber has an injection zone $M_1$ into which chemical components are fed and atomized, as well as a mixing zone $M_2$ that if coaxial with the zone $M_1$. The flux of material at the output of the chamber $M_2$ has an undesirable high level of turbulence due to the height, velocity, and bubbling of the mixture.

The structure illustrated in the middle figure was developed in response to problems encountered with use of the structure in the top figure. This structure has an injecting zone $M_1$ alinged [sic] with a mixture zone $M_2$. The two zones are referred to as "a cylindrical mixing chamber 1" in Reference A. A third zone $M_3$, which is referred to in Reference A as "quieting chamber 12", forms an angle of 90° with the aligned chambers $M_1$ and $M_2$. It should be noted from the drawings in Reference A that the inlets for the chemical components are spaced a relatively large distance from the output end of the mixing chamber.

Considering now the present invention, the invention starts from a different point of view, that is, changing the arrangement of the components of the injecting zone $M_1$ and the mixture chamber $M_2$. According to the present invention, the mixing chamber has a first injecting zone $M_1$ defining a pre-mixing chamber having a small diameter and a very short length, and a second mixing zone $M_2$ positioned at 90° to the zone $M_1$ and having a relatively large diameter and greater length. The different diameters and dispositions of the zones $M_1$ and $M_2$ improve the quality of the mixture for the following reasons:

First, the small distance between the inlets for the components (because of the small diameter of section $M_1$) improves the atomizing effect and, therefore, the mixing degree, as well as the chemical reaction between the components; and

Second, changing the flux direction at a location close to the inlets for the chemical

the claims to disclose fluid communication between the chambers, which the Examiner would further consider as a basis for granting the application over the '128 Patent. DX 225, 38. The amendment, filed May 12, 1981, substantially rewrote Claim 1. Dr. Fiorentini again sought to distinguish the '128 Patent on the grounds it does not disclose the location of the inlet nozzles, use of a short mixing chamber, and fluid communication between the chambers. DX 225, 45–49.[28] After two more interviews, where plaintiff agreed to cancel Claim 2 and add its substance to Claim 1, the Examiner allowed the application. Throughout the application and amendments, plaintiff cited, *inter alia*, the following as prior art: the '128 Patent; the '335 Patent; United States Patent No. 4,141,470; United States Patent No. 3,952,991. DX 225 at 31, 56; DX 226 at 43.

## 2. The Foreign Patent Prosecutions

Throughout the prosecution of the United States application, Dr. Fiorentini did not cite the Upjohn '299 Patent. He had also filed parallel patent applications in Italy, France, Japan, West Germany, and Great Britain.[29] On March 19, 1979, a British Patent Office search report cited only the British counterpart to the Upjohn '299 Patent as relevant to the Fiorentini patent

application. DX 17. On April 3, 1979, Afros' patent counsel, Luigi Coloberti, informed Dr. Fiorentini of the British Patent Office rejection. Mr. Coloberti stated in a letter, "Not considering the injection of the third component, it appears to us that the [Upjohn '299 Patent] head, according to the cited British patent, *anticipates* the characteristics of your FPL head." DX 16 (emphasis added). On May 8, 1979, Mr. Coloberti sent another letter, this time in relation to the pending United States application, stating, "We feel that the examiner's request should be evaluated taking into account also the ['299] British Patent recently made public." DX 22. Regarding the West German application, on July 17, 1979, Mr. Coloberti informed the local patent counsel "it is necessary to study the case and propose a new set of claims to overcome a possible citation of Krauss-Maffei ['128 Patent] and Upjohn ['299 Patent] against this application." DX 125. The search report submitted with the French and West German patent applications cited the Upjohn '299 Patent as prior art. DX 25, 103.

The British Patent Office twice rejected Dr. Fiorentini's application on the ground the Upjohn '299 Patent embodied the same invention. DX 82, 101. In the second rejection, the British Examiner stated,

by this Amendment to include a specific recitation that fluid communication is maintained between the discharge duct during substantially the entire period during which individual components are fed into the mixing chamber. It is submitted that there is no teaching or suggestion of such claimed feature in [the '128 Patent]. There is also no teaching or suggestion of this claimed feature in Reference B (Schiraki et al). Accordingly, it is submitted that the claims in the application define subject matter that is non-obvious in view of the references cited by the Examiner.

components, that is a location in which there is a very high kinetic energy and great turbulence (output of $M_1$), further improves the mixing action and the quality of the mixture. Such improving effect is not possible in the structure of Reference A because the quieting section $M_3$ is spaced a relatively large distance from the component inlets. As can be seen from the lower sketch in Appendix B, particles A and B, after leaving the mixing chamber, impinged on the walls of section $M_2$, rebound several times thereby increasing the probability of contact and chemical reaction between the parties, and then continue passage through the discharge duct at a reduced velocity. Advantages provided by the present invention are described in more detail on pages 4 to 6 of the application.
DX 225, at 45–47.

**28.** The Remarks accompanying this final amendment state:

As discussed with the Examiner during the interview, claims 1 and 10, the independent claims in the application, are being rewritten

**29.** The foreign patent applications corresponding to the '335 Patent are:

| Country | App. Serial No. | Filing Date |
|---|---|---|
| Italy | 21022 A/78 | 03–09–78 |
| Japan | 20244/79 | 02–24–79 |
| France | 78/33205 | 11–24–78 |
| Great Britain | 45845/78 | 11–23–78 |
| West Germany (patent) | P2907938.7 | 03–01–79 |
| West Germany (Utility Model) | G7905666–9 | 03–01–79 |

Whilst appreciating your interpretation of the prior disclosure it is not clear that the subsequent amendment of claim 1 by the inclusion of proportional relationship in construction meets the objection to prior disclosure since the drawing of [the Upjohn '299 Patent] clearly indicates the construction claimed in claim 1.

DX 101. Dr. Fiorentini submitted an amendment to claim 1 of the British application specifying the short length of the mixing chamber and the location of the inlet nozzles "in close proximity to" the discharge chamber. PX 3, 1720. Mr. Coloberti sent Dr. Fiorentini a letter explaining "we thought it advisable to propose a new claim, which would specify the position of the intake parts of the components, in conformity with German practice." DX 100. The British Patent issued on October 27, 1982, with the amended claim 1. PX 3, at 1749.

The record is not clear what role the Upjohn '299 Patent played in the other foreign patent applications, and the French, Italian, and West German patents issued. Mr. Coloberti testified at a deposition that KMAG relied on only the '128 Patent in opposing the Fiorentini West German patent application, and a decision against Afros by the West German Patent Office only referenced the '128 Patent, not the Upjohn '299 Patent.[30] Tr. 1739–41. Defendant did not introduce evidence to refute the deposition testimony.

### 3. Materiality of '299 Patent
#### a. Foreign Prosecution Citation

Defendant's strongest evidence of the materiality of the Upjohn '299 Patent is the British Patent Office rejections in 1981.

Those rejections indicate the importance the Upjohn '299 Patent might have played in the United States prosecution. The citation of the '229 Patent as prior art in other foreign applications is additional evidence that it falls in the realm of material information that could have had relevance for the United States Examiner in reviewing Dr. Fiorentini's application. The degree of materiality, however, depends on how the Upjohn '299 Patent relates to the cited prior art, and how the Examiner would have found it relevant.

Two facts diminish the importance of the initial British rejections of Dr. Fiorentini's application on the basis of the Upjohn '299 Patent. First, the Upjohn '299 Patent was the only prior art cited, and the British Examiner did not have available the '515 or '128 Patents. PX 3, at 1637. Those Patents, especially the '128 Patent, disclose the L-shape, and are at least as important as the Upjohn '299 Patent. Second, the reason for the rejection was that the Upjohn '299 Patent "indicates the construction claimed in claim 1." The British Examiner apparently considered the Upjohn '299 Patent as anticipating the L-shape configuration, and found the proposed amendment disclosing the relative sizes of the chambers insufficient to distinguish Dr. Fiorentini's claimed invention. DX 3, at 1709. Plaintiff's final amendment, disclosing the location of the inlet nozzles together with the short mixing chamber, seems to have been enough to overcome the Examiner's objections. The Upjohn '299 Patent is not the only one teaching the L-shape, and therefore the Examiner's citation to that Patent alone does not automatically increase its materiality vis-á-vis other prior art cited in the United States application.

---

**30.** Although plaintiff received a West German patent, KMAG made an application for nullity of the Afros West German "Utility Model." *See* DX 136. The Utility Model application appears to be part of the West German patent issuing process, but the parties did not clearly explain how it relates to the patent issued to plaintiff. An initial finding on the patent adverse to Afros was handed down in 1982, but a West German court recently rendered a decision in favor of plaintiff. The parties have submitted letters discussing the implications of the latest decision, but neither the West German court's decision nor the letters are part of the record. Letters from Carl Love, Esq., to the Honorable Murray M. Schwartz, July 8, 1987, and July 20, 1987; letter from Robert Koch, Esq., to the Honorable Murray M. Schwartz, July 17, 1987. The only inference the Court will draw from the West German patent application proceedings is defendant's knowledge of plaintiff's claim for a patent in West Germany. The Court has not considered the parties' submissions, including the latest West German patent decision, in reviewing the inequitable conduct defense.

### b. United States Prosecution History

As opposed to the British application, the primary basis for the United States application rejections was the '128 Patent. Defendant argues the plaintiff's attempts to distinguish the '128 Patent by describing that patent as only claiming a batch process for dispensing polyurethane show the materiality of the Upjohn '299 Patent, which discloses open fluid communication between the chambers in a manner identical to the '335 Patent. According to defendant, the question of fluid communication between the chambers was sufficiently important to make the Upjohn '299 Patent's disclosure of that feature highly material prior art. Plaintiff argues it had also sought to distinguish the '128 Patent to the Examiner as not disclosing two other features: 1) short length of the mixing chamber and 2) location of the inlet nozzles.

The '299 and '128 Patents do not differ in any significant respect concerning their teaching.[31] Where they differ is the Upjohn '299 Patent clearly teaches fluid communication between the chambers, while the operational specification of the '128 Patent discloses a batch operation. The '128 Patent does not, however, foreclose fluid communication between the chambers, as demonstrated by the Examiner's consistent reading of the '128 Patent claims as disclosing that feature. DX 226 at 57. The Upjohn '299 Patent, therefore, is material prior art for fluid communication, but otherwise cumulative of the '128 Patent.

The '335 Patent prosecution history makes clear the Examiner read the '128 Patent as disclosing fluid communication between the chambers. Plaintiff argued to the Examiner that the cited prior art did not disclose this aspect of the invention. The issue of fluid communication remained significant enough for the Examiner, however, to require explicit claim language before the '335 would issue over the prior art.

### c. Conclusion

██ Materiality cannot be quantified in any exact manner, but a thorough review of the '335 Patent prosecution and the relevant teaching of the Upjohn '299 Patent show that the latter's degree of materiality is relatively low. The Upjohn '299 Patent only discloses one aspect not clearly shown in the '128 Patent, fluid communication, and the Examiner's interpretation of the '128 Patent included that principle within the prior art. The '299 patent would not have added much to the Examiner's understanding of the state of the art, although reference to an additional L-shape patent might have clarified the Examiner's comprehension of the claims. The foreign patent applications show the Upjohn '299 Patent had relevance to Dr. Fiorentini's application, but that fact standing alone does raise the level of materiality to any great degree. Moreover, the principle of fluid communication is not central to the primary teaching of the '335 Patent, which is the location of the inlet nozzles close to the discharge chamber to permit a design with a short mixing chamber.

### B. Intent

The record is clear Dr. Fiorentini knew of the Upjohn '299 Patent's existence from the letter Mr. Coloberti sent concerning the British Patent Office rejection. DX 100. He also admitted to having reviewed the Patent. Tr. 1717. The key question is whether the Court can infer from this knowledge the intent to withhold material prior art, or gross negligence.

Mr. Coloberti testified at a deposition he requested that Dr. Fiorentini review the Upjohn '299 Patent. After the review, he stated Dr. Fiorentini considered the Patent "absolutely irrelevant" in comparison to other FPL heads. Tr. 1738. Dr. Fiorentini testified at a deposition that he understood the '299 as being concerned solely with frothing of polyurethane through the intro-

---

**31.** Mr. Schneider read the '335 Patent claims on to both the '299 *and* '128 Patents. Tr. 1345–47; 1395–96. Taken at face value, this testimony indicates the prior patents are cumulative of one another, and the failure to cite one would not be a material omission. The Court does not, however, fully credit Mr. Schneider's testimony on this issue. But his statements do point out the similar disclosures of the three patents, and to that extent the testimony is credible.

duction of a third component in the mixing head. Tr. 1716.

The Court recognizes in considering this testimony that Dr. Fiorentini, intimately involved in the patent application process, would minimize the importance of other patents. There is, however, an objective basis for the statements that the Upjohn '299 Patent is not relevant prior art. That Patent's primary teaching is frothing, as stated in both the claims and specification. *See* DX 215. It also notes the second mixing head can be removed to permit separate use of the heads in a "conventional" manner if frothing is not needed. The disclosure raises questions concerning the Upjohn '299 Patent's direct relevance to plaintiff's application because Dr. Fiorentini's invention teaches mixing the two chemical components in a single L-shape head.

Mere knowledge of the Upjohn '299 Patent does not, without more, demonstrate an intent to withhold material prior art from the Examiner. The key is whether the materiality of the Upjohn '299 Patent was apparent to show that knowledge of the Patent's teaching demonstrates the necessary intent. The Court finds the level of intent that can be inferred from Dr. Fiorentini's knowledge is not high because he had a reasonable basis for concluding the Upjohn '299 Patent was irrelevant or only cumulative prior art.

Even if Dr. Fiorentini's subjective good faith were fully credible, it would not negate the question of whether he was grossly negligent for not disclosing the Upjohn '299 Patent to the United States Examiner. The standard applied is objective, whether plaintiff should have known the patent was material prior art. In analyzing the issue, the relation of the patent to the prior art, i.e., its materiality, again plays the central role. The more material information is, the less it can be considered reasonable to withhold it.

As discussed above, the Upjohn '299 Patent's relevance is low when considered in conjunction with the cited prior art. The only issue on which it could have a material effect was fluid communication between the chambers, a principle also applied by the Examiner to the '128 Patent. It is not readily apparent the Upjohn '299 Patent expanded on the prior art for standard polyurethane mixing heads in this way, especially given the focus of its teaching on a method for frothing. The Upjohn '299 Patent, *considered as a whole*, does not clearly expand on or alter the teaching of the '128 Patent, and it is not unreasonable to consider the latter Patent as representing all of the prior art teaching for L-shape mixing heads.

The British Patent Office citation and Dr. Fiorentini's acknowledgment of the Upjohn '299 Patent as part of the L-shape "family" of mixing head patents demonstrates negligence in the failure to cite it. The Court cannot, however, find the failure to disclose rises to the level of gross negligence because there is a reasonable basis to believe the Upjohn '299 Patent irrelevant, or at least cumulative of the '128 Patent. Although caution is preferred in patent prosecutions, simple negligence cannot suffice to find the requisite intent for inequitable conduct.

## C. Balancing Materiality and Intent

Defendant's inequitable conduct defense relies primarily on the British Patent Office rejection of Dr. Fiorentini's application, the '335 Patent prosecution history, and Mr. Schneider's testimony that the '335 Patent claims read on the Upjohn '299 Patent. If the testimony were fully credited and all possible inferences drawn favorably for the defendant, the outcome would likely be different. However, Mr. Schneider also testified the '335 Patent reads on the '128 Patent, and defendant's post-trial proposed findings of fact request a finding that the '128 Patent discloses fluid communication between the chambers in order to prove its infringement counterclaim. Defendant cannot have it both ways. If the '128 Patent discloses fluid communication, a position the Examiner held, then the Upjohn '299 Patent could not materially add to the prior art on fluid communication. The Examiner's requirement that plaintiff specifically include claim language for open fluid communication between the chambers

was to assure that the '335 Patent claimed fluid communication rather than have the Examiner infer it, as was done with the '128 Patent, which failed to describe the operation in the claims or specification.

The Court finds the Upjohn '299 Patent's degree of materiality as prior art for the '335 Patent to be low. While Dr. Fiorentini was negligent in not citing the Upjohn '299 Patent to the Examiner, he did not act with a reckless disregard or with any significant degree of intent to withhold material prior art. In balancing the materiality and intent elements, I hold they do not rise to the level of inequitable conduct, and as a consequence the defendant has failed to prove by clear and convincing evidence the '335 Patent is unenforceable on the basis of plaintiff's conduct before the PTO.

## V. INFRINGEMENT

Plaintiff argues the UL mixing heads literally infringe Claims 1, 6, 8, and 9 of the '335 Patent. Defendant's primary defense revolves around whether the inlet nozzles in the KMAG head are as "close" to or "in close proximity to" the discharge chamber as claimed by the '335 Patent such that they infringe the Patent. The issue has been clearly framed by the parties.

To prove infringement, the patentee must show "that the accused devices embody every element of the claim." *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 257 (Fed.Cir. 1985). The Court must undertake a two-step analysis in considering infringement: "first, the language of the claim must be interpreted; and second, it must be determined whether the claim 'reads on' the accused product or process, that is, whether the claimed invention is being made, used, or sold by the alleged infringer."

*Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985); *see Loctite Corp.*, 781 F.2d at 866–67.

The Court's analysis of the meaning of "close" as used in Claims 1 and 6 on the issue of specificity under § 112, second paragraph, applies equally to claims construction for infringement. The Court concluded "close" means as close as possible to effectuate mixing in the chambers through placement of the inlet nozzle and the concomitant length of the mixing chamber, as understood by a person of ordinary skill in the art applying principles of fluid dynamics. *See supra*, text at 1424.

For the purpose of illustrating the meaning of "close" in the '335 Patent, the length-diameter ratio for the FPL heads varies according to the size of the chambers, ranging from .42 to 1.00. The UL heads uniformly have a larger ratio in relation to comparable FPL heads, ranging from .83 to 2.11. PX 151. In all, defendant markets eight heads with different dimensions, although only five have been sold in the United States by KMC. Defendant argues the UL heads' greater ratio demonstrates noninfringement, and that for it to have infringed the '335 Patent its UL heads would have to have length-diameter ratios similar, if not identical to the FPL heads. The parties do not manufacture heads with mixing and discharge chambers having identical diameters, but the various devices are similar enough to permit fair comparison. DX 181; PX 151.[32]

The location of the inlet nozzles on defendant's mixing heads is directly affected by its use of sealing grooves on the mixing piston to keep the chemical components from interacting when the head is closed. The grooves, which are not employed in the '335 Patent or the FPL heads, add

---

**32.** The length-diameter ratios, comparing the length of the mixing chamber from the inlet nozzles to the discharge chamber to the mixing chamber's diameter, of the different sized mixing heads are as follows:

MK FPL

| UL Mixing Heads | | FPL Mixing Heads | |
|---|---|---|---|
| Type | Length-Diameter Ratio | Type | Length-Diameter Ratio |
| MK–6/8 2K | 1.17 | FPL–10 | 0.86 |
| MK–8/12 2K | 1.00 | | |
| MK–8/12 3K | 2.11 | FPL–14  * | 0.50 |
| MK–12/16 2K | 0.833 | | |
| MK–12/16 3K | 1.33 | FPL–18 | 0.42 |
| MK–16/25 2K | 1.25 | | |
| MK–16/25 4K | 1.41 | FPL–24 | 0.67 |
| MK–20/36 2K | 1.10 | | |

PX 151.

about one and one-half millimeters to the area between the face of the mixing piston and the recirculation grooves. Tr. 601–02. The reason the sealing grooves affect the design of the mixing chamber and location of the inlet nozzles is that the area between the recirculation grooves and the piston face must be greater to accommodate the sealing grooves. The greater the distance between the recirculation grooves and the piston face, the further away from the discharge chamber the inlet nozzles must be, thereby increasing the length of the mixing chamber. *See* Tr. 1463.

The effect of the sealing grooves on the mixing chamber length-diameter ratios explains much of the difference between the FPL and UL heads' respective ratios because the added length of the UL mixing piston requires a longer mixing chamber and placement of the inlet nozzles further from the discharge chamber. Mr. Schneider testified the use of either sealing grooves or a highly precisioned mixing piston with a very low tolerance between the outer edge of the piston face and the chamber wall are questions of design choice, and both are practical. Tr. 1461–63. Moreover, three of the alleged infringing devices have additional inlet ports bored through to the mixing chamber to introduce additional components, such as a color additive. These ports will require an even greater length in the mixing chamber in order to permit impingement of all components. Tr. 607–08.

Defendant did not introduce evidence to rebut the plaintiff's testimony that the sealing grooves and additional inlet ports require the UL heads to have a longer mixing chamber by placing the inlet nozzles a greater distance from the discharge chamber to accommodate the longer piston stroke. Instead, KMC argues that if it wished to make a mixing head with the inlet nozzles as close as in the Afros heads, it would abandon sealing grooves and adopt Afros' use of highly precisioned pis-

tons. Defendant's argument does not address the fundamental issue of whether the UL head's inlet nozzles are "close" to the discharge chamber within the meaning of the claims. The length-diameter ratios make clear the alleged infringing heads' inlet nozzles are "close," and the mixing chambers are within the coverage of the '335 Patent Claims, because their design places them within the area in which the mixing will occur in both chambers due to the location of the inlet nozzles.

The testimony of Dr. Macosko, defendant's expert, was that the length-diameter ratio in an L-shape head could be as high as 5:1, and still be effective, but all of defendant's devices, except one, fall within the narrow range of ratios less than 2:1. The Court also finds Dr. Garris' testimony, highlighted through the use of transparent overlays made from the engineering drawings of the UL and FPL heads, persuasive that the difference between the mixing chamber length is so minor as to be *de minimis*. PX 29.[33] The blueprint comparisons make graphically clear the degree UL heads infringe the '335 Patent because the size and design of the heads are nearly identical, specifically in the placement of the inlet nozzles and the length of the mixing chamber.

▇▇▇ The UL mixing heads are not identical to the FPL heads, but the length of the mixing chambers and location of the inlet nozzles in the defendant's devices falls within the relevant claims of the '335 Patent. The Court finds, therefore, the defendant has infringed the '335 Patent. That the particular UL design does not place them as "close" as Afros' design does not affect a finding of infringement because the Court is not solely concerned with exacting comparison between the competing heads. *See Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481–82 (Fed. Cir.), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984) ("Infringement

---

**33.** The parties' pretrial stipulation that the FPL mixing heads conform to the '335 Patent drawings and description makes the comparison of the engineering drawings relevant to the infringement inquiry. The Court is not simply comparing the devices, but using the commercial embodiments as a means to determine how closely the defendant's devices come to the '335 Patent claims *as applied* in the FPL heads.

is not determined by comparison between parts of the description in a patent and the accused process or product, or by comparison between commercial products sold by the parties."). The commercial embodiments are good illustrations of the infringement, and provide additional evidence to support the Court's finding.

## VI. WILLFUL INFRINGEMENT

■ In light of the Court's finding of literal infringement, plaintiff argues the defendant's sale of the infringing UL mixing heads should be found willful, and requests an assessment of increased damages. Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed." Before the court may enhance the damages, it must make findings of fact demonstrating willful infringement or bad faith. *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 277 (Fed.Cir.1985).

■ The Court of Appeals for the Federal Circuit has established a "totality of the circumstances" test for assessing the willfulness of an infringement. *Central Soya Co., Inc. v. George A. Hormel & Co.*, 723 F.2d 1573, 1577 (Fed.Cir.1983); *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390 (Fed.Cir.1983). There is no *per se* rule of willfulness. *Rolls-Royce, Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed.Cir.1986). Three significant factors to be assessed in determining the totality of the circumstances surrounding a party's infringement are:

(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of

the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed[;] and (3) the infringer's behavior as a party to the litigation.

*Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986). Actual notice of the patent imposes an *affirmative* duty of care on the infringer that "will normally entail the obtaining of competent legal advice of counsel before infringing or continuing to infringe; that does not mean, however, that absence of an opinion of counsel alone *requires* in every case a finding of willful infringement." *Rolls-Royce Ltd.*, 800 F.2d at 1109 (emphasis in original).[34] *See Rite-Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1125 (Fed.Cir.1987) (weight accorded to presence or absence of counsel's opinion varies with circumstances of each case).

### A. Copying

The striking similarity between the '335 Patent and the UL mixing heads is the starting point for determining whether the defendant willfully infringed the '335 Patent. The parties stipulated prior to trial the FPL heads conform to the description and drawings of the '335 Patent, and therefore a comparison of their respective products can aid in determining if defendant copied the FPL head in designing its own mixing head. Plaintiff demonstrated through a series of transparent overlays, created from the parties' engineering drawings, the nearly identical design of the heads. PX 29. Further review of the exhibits reaffirms the Court's initial impression at trial that differences between the

34. The standard for judging the legal advice in the context of willful infringement is relatively high, and the courts look to the scope and timing of the investigation to determine whether the advice will suffice to establish an infringer's good faith. *See Bott*, 807 F.2d at 1572 (oral opinions from in-house counsel consisting of conclusory statements do not constitute authoritative opinion for good faith reliance); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 656 (Fed.Cir.), *cert. denied*, 474 U.S. 902, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985) (conclusory statements of defense counsel's aspirations in patent suit not an authoritative opinion); *Rosemount, Inc.*, 727 F.2d at 1548

(infringer's in-house memos by engineers and executives insufficient to create honest doubt regarding patent's validity and infringement); *Underwater Devices Inc.*, 717 F.2d at 1390 (counsel's ordering patent file wrapper 9 months after infringement began factor to consider in sufficiency of legal advice). An infringer's attempt to design around a patent can be sufficient evidence of good faith even though it may have received inadequate legal counsel on whether infringement had been avoided. *Rolls-Royce Ltd.*, 800 F.2d at 1110; *Radio Steel & Mfg. Co. v. MTD Products*, 788 F.2d 1554, 1559 (Fed.Cir. 1986).

products is one of slight degree in all important respects involving the claims. Although the defendant's UL mixing heads tend to be larger, the internal dimensions and configuration are very close to those of the plaintiff's product, including the size of the chambers, location of the inlet nozzles, and component recirculation system. *See* Tr. 717 (Dr. Garris: "Well, the geometry for the two heads is remarkably similar, it is almost identical.").

Two additional facts must be considered as shedding considerable light on the similarities between the heads. First, plaintiff's expert, Dr. Garris, stated he believed the UL heads' design and engineering drawings were the product of study and copying of the FPL design. Tr. 825. Dr. Garris is a qualified expert in mechanical engineering, and testified from his extensive experience in reading and applying engineering drawings to mechanical devices. Defendant introduced no evidence to attempt to rebut Dr. Garris' testimony concerning copying of the FPL head, and perhaps more interestingly, never cross-examined Dr. Garris on the basis of his opinion. This is all the more striking because Dr. Garris' statement came immediately prior to defendant's cross-examination of him, and yet these provocative statements were never addressed. The Court credits Dr. Garris' opinion that the similarity between the engineering drawings is attributable to defendant having copied the FPL design.

Second, the evidence available on the development of the UL head does not disclose development in the direction of the ultimate design of the product. In its effort to commercialize a "Mini Mixing Head," which became the UL head, notes from a KMAG research and development meeting on January 14, 1980, state the project "has the *highest priority* in order not to suffer any losses in the market." PX 105 (emphasis added). The notes reveal the company's current design innovation was the addition of a "deflection piece" to the mixing head. PX 105. According to Dr. Garris, the only witness to testify on the question, the deflection piece would be attached to the end of the discharge chamber. Tr. 763. Subse-

quent testing documents show KMAG's primary research concern was focused on limiting the effect of the transient phenomenon in the product. PX 105; Tr. 764.

Mr. Guenther Mueller, a KMAG sales engineer, stated he first saw a UL mixing head in 1980 "coming into the lab," Tr. 1293, which coincides with the relevant development period indicated in the KMAG research notes. Mr. Phillip Schneider, technical manager of KMC's RIM Division, testified at a deposition that the first UL head sold through KMC occurred in August or September, 1982. Tr. 845. In the early 1970s, KMAG tested a prototype of the '128 Patent, but encountered problems and the head was not commercialized by 1976, when Mr. Schneider left KMAG's employ. Tr. 853–54.

The testimony and documents presented by plaintiff show at best a sketchy outline of the UL head's development. They do not, however, give any indication of the means by which KMAG designed a mixing head strikingly similar to the FPL head. The research notes show a concern with limiting the transient phenomenon through the use of devices external to the mixing and discharge chamber, i.e., the deflection piece, an effort apparently abandoned some time before the UL heads were marketed. The Court also notes that a beneficial effect of the '335 Patent design is in limiting the transient phenomenon through the use of a smaller, lighter piston. This was the primary problem KMAG's research and development effort sought to control.

The development date of the UL heads, which reached the market in mid–1982, the bare documentary record showing development in directions away from the UL head's ultimate design, considered together with Dr. Garris' unrebutted testimony, leads the Court to infer that KMAG copied the Afros mixing head at some point after 1980. This is the most plausible explanation for the sudden emergence of the UL heads after an apparently extensive research and development program, one with the "highest priority," in which no developmental drawings have been introduced showing that KMAG considered a design

incorporating a short mixing chamber with a discharge chamber of greater diameter. Moreover, KMAG's concern with protecting its share of the high-pressure mixing head market lends further credence to the inference that the UL head's design is copied from the commercially successful FPL head. Defendant did not introduce records or drawings to show KMAG's development of the UL heads, and indeed never addressed the question of how it could have created a device so similar to plaintiff's by an independent process. The Court finds there is strong circumstantial evidence the defendant copied the plaintiff's patent for itself.

## B. Notice

KMAG knew Afros was marketing L-shape mixing heads as early as April 19, 1979. KMAG sent a letter on that date to Cannon, inviting attention to the '128 and '515 Patents and asking whether the FPL head infringed those Patents.[35] DX 52. After Cannon failed to respond, KMAG sent a second letter requesting a response on the infringement question. DX 53. There is no evidence in the record that Cannon or Afros ever replied, or that KMAG took further action on the issue. Afros' sales of FPL heads achieved rapid commercial success around the time KMAG sought to develop its "Mini Mixing Head," totaling 211 sales worldwide in 1980 and 250 in 1981. PX 31.

According to the various descriptions at trial of the mixing head market, the number of manufacturers appears to be small, and the competitors apparently monitor one another's activity. Defendant knew of plaintiff's application for a patent in West Germany no later than July 27, 1981, when it filed a brief in support of its opposition to plaintiff's Utility Model, petitioning the West German patent office to cancel the Utility Model. See PX 184 (timeline of events in all Afros patent prosecutions). Defendant argued to the West German patent authorities, *inter alia*, that the plaintiff's application did not distinguish over other patents. DX 136 at 1.

The '335 Patent issued on June 1, 1982. Plaintiff has not presented evidence of when defendant had actual notice of plaintiff's United States Patent rights. Defendant's awareness of the FPL heads, as evidenced by the 1979 letters, its acknowledged concern with losing its market share, and active participation in the West German patent process leads the Court to infer defendant had notice of the '335 Patent in the United States. Defendant argues in its brief, without benefit of testimony, that it only became aware of the Patent when Afros filed suit on June 29, 1984. Defendant relies on *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed.Cir.1985), that "[t]o willfully infringe *a patent,* the patent must exist and one must have knowledge of it." *Id.* at 1236 (emphasis in original). The Federal Circuit Court of Appeals has held that *State Industries* does not mean manufacture of a device before the patent issues means there can be no infringement. *Shiley, Inc. v. Bentley Laboratories, Inc.*, 794 F.2d 1561, 1568 (Fed. Cir.1986). The issue of willfulness does not rest solely on the timing or knowledge of the patent, but on the totality of the circumstances. *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 979 (Fed.Cir.1986); *Pacific Furniture Manufacturing Co. v. Preview Furniture Corp.*, 800 F.2d 1111, 1114 (Fed.Cir.1986). A finding of willful-

---

**35.** KMAG's letter to Cannon states:

ATTN: President
Dear Sir:
We invite your attention to US–Patent Nos. 3,706,515–Keuerleber et al. and 3,975,128–Schluter covering a device for feeding flowable material to a mold cavity, which patents are owned by us. We have seen from the figs. 1 to 3 of a prospectus of the Italian firm afrós "cannon F.P.L." that your firm is offering and selling to the trade, in the United States, devices according to these patents.

Enclosed find copies of these patents for your information.
It is suggested that you test this matter and advise us of your intentions as soon as possible. If you are of the opinion that the device of "cannon F.P.L." does not infringe we would like that you tell us in what manner this device differs.
Very truly,
Krauss-Maffei
Aktiengesellschaft
DX 52.

ness, however, and any assessment of increased damages, cannot commence until the issuance of the patent, at the earliest.

■ The Court rejects defendant's notice argument as beyond credibility, given KMAG's awareness of the FPL heads, their effect on the market, and knowledge of the patent process in at least one other country. *See Pacific Furniture Manufacturing Co. v. Preview Furniture Corp.,* 626 F.Supp. 667, 676 (M.D.N.C.1985), *aff'd,* 800 F.2d 1111 (Fed.Cir.1986) (circumstantial evidence used to prove infringer's knowledge of patent). Moreover, the previous finding that KMAG copied the FPL design demonstrates the attention given to Afros' product. An infringer cannot remain ignorant of a competitor's patent rights when it displays a continuing knowledge of the product, awareness of foreign patent proceedings, and concern with that product's effect on its own commercial position. Upon review of the circumstances, the Court finds KMAG and KMC had actual notice of the '335 Patent within a reasonable period after its issuance on June 1, 1982.

■ When an infringer has actual notice of another's patent rights, it has a duty of due care that includes seeking and obtaining "competent legal advice from counsel...." *Underwater Devices Inc.,* 717 F.2d at 1389. Defendant did not introduce evidence that it ever sought legal advice concerning the '335 Patent, and indeed that it ever considered investigating in any way the scope of Afros' United States patent rights for the FPL head. Defendant appears to have blithely gone ahead with manufacturing and marketing a mixing head copied from a competitor's product without stopping to consider whether it infringed a patent. Legal advice was sought only upon plaintiff filing suit, a full two years after the '335 Patent issued. Seeking counsel after two years of infringing activity, and then only in response to a lawsuit, cannot alone meet the duty of care.

## C.  Tactics

The defendant's tactics defending this suit buttress the plaintiff's argument that the infringement was willful. Shortly after the case commenced, KMAG assigned the '128 and '515 Patents to its subsidiary, KMC, a transaction designed to protect KMAG from liability. The parent did not, however, transfer any documentation concerning the development of the patents or design of the UL heads (which are ostensibly based on those patents) to the United States subsidiary. The effect of KMAG's action was to attempt to insulate itself not only from liability but also from the discovery process. Upon plaintiff's motion for production of documents held by KMAG, defendant argued the foreign parent had nothing to do with the litigation and was not within KMC's "control" such that any documents it held fell within the power of this Court to order discovery. *See* 113 F.R.D. 127, 129–31 (D.Del.1986). After the order directing discovery, two exceptionally important sets of documents were produced: the UL mixing head engineering drawings and the research and development documents KMAG chose to turn over. The former proved to be probative on the question of literal infringement, and both are highly relevant to the issue of willfulness. Moreover, any party to patent litigation involving a mechanical device should know from the outset that engineering drawings and development records will be crucial to both sides and subject to discovery.

The patent assignment and decision to resist discovery of the non-party foreign parent's documents were not, standing alone, illegitimate or unconscionable acts. Defendant's argument on the discovery motion was colorable. The goal of these acts, however, appears to have been to frustrate plaintiff's case and shield evidence that helps to establish literal infringement and willfulness.

Resisting discovery requests is certainly not unheard of, to say the least, but defendant's approach was one designed to frustrate the fair discovery of highly relevant evidence. The defendant's unac-

ceptable tactics bear directly on the issue of willfulness because the documents it attempted to shield from discovery form part of the core proof on this question. *See Yarway Corp.*, 775 F.2d at 277 ("vexatious litigation behavior or unacceptable tactics" may prove bad faith for finding of willfulness). Therefore, the Court will weigh defendant's litigation conduct in favor of a finding of willful infringement.

### D. Enhanced Damages Under § 284

In reviewing the totality of the circumstances, defendant's copying of the FPL design and ongoing knowledge of Afros' product weigh heavily in favor of a finding of willfulness. Defendant did not present evidence showing how the UL heads were developed and whether it concerned itself whatsoever with avoiding infringement of the '335 Patent or seeking competent legal advice. Defendant's tactics in attempting to frustrate plaintiff's legitimate discovery requests by shielding relevant documents further demonstrates the willful nature of defendant's infringement of the '335 Patent. The Court finds, therefore, the defendant willfully infringed the '335 Patent.[36]

Upon a finding of willfulness, "increased damages 'may' be awarded at the discretion of the district court, and the amount of increase may be set in the exercise of that same discretion." *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed. Cir.1986), *cert. denied sub nom., Stora Kopparbergs Bergslags AB v. Crucible, Inc.*, — U.S. —, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987). The degree of willfulness shown in KMAG's infringement is relatively high, especially given the evidence of copying in the design of the UL heads. *Cf. Rite-Hite Corp.*, 819 F.2d at 1125–26 (willfulness is a question of degree). In balancing the equities of defendant's continuing infringement with the effect on plaintiff's sales, the Court will award the plaintiff an amount triple its actual damages.

### VII. ATTORNEY FEES

Under 35 U.S.C. § 285, "The court in exceptional cases may award reasonable attorney fees to the prevailing party." The initial question is whether a party's actions qualify the case as "exceptional," which is a finding of fact. *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986); *see King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 867 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). Among the factors to be considered are the closeness of the case, *see Kloster Speedsteel AB*, 793 F.2d at 1580 (infringement may produce "an unnecessary and outcome-certain lawsuit"), and the parties' conduct and their counsel's trial tactics, including evidence of bad faith. *Rolls-Royce Ltd.*, 800 F.2d at 1110–1111. Once a determination is made that the case is exceptional, then the court may exercise its discretion to award attorney fees. *S.C. Johnson & Son, Inc.*, 781 F.2d at 201.

The Court's finding that KMAG copied the FPL heads could, standing alone, demonstrate the exceptional nature of the case because the infringement was willful. *Kloster Speedsteel AB*, 793 F.2d at 1581; *see Pacific Furniture Manufacturing Co.*, 626 F.Supp. at 679 (deliberate copying alone warrants award of attorney's fees). Defendant also pursued other tactics that evidenced a begrudging cooperation with plaintiff's requests. After the Court ordered production of KMAG documents relating to the development of the UL head and the engineering drawings, defendant initially limited the discovery to an office inspection. Upon plaintiff's motion to compel, the parties eventually stipulated to an order permitting copying of the drawings after sensitive information had been expunged. Dkt. 125. This occurred five weeks prior to the pretrial conference. Defendant then submitted a motion to add two witnesses on the patent assignment

---

**36.** The only standard identified by the Federal Circuit for determining willfulness is the "totality of the circumstances" test. The Court of Appeals has not stated whether willfulness must be shown by a preponderance of the evidence or by clear and convincing evidence. Even under the higher standard, however, plaintiff's proof demonstrates the defendant acted willfully.

issue the Friday before trial, requiring mid-trial depositions before the Court would permit them testify. Defendant had notice of the assignment issue at the pretrial conference five weeks *before* trial. *See* Transcript of Pretrial Conference, Dkt. 133, at 46. Moreover, defendant's primary expert, Dr. Macosko, was not prepared for a deposition three weeks before trial, but defendant then sought to have him testify on questions he could not answer at the earlier examination. An agreement limiting the testimony was ultimately hammered out during trial. Finally, requests for discovery by plaintiff arose during trial in order to test the veracity of statements made by defendant's witnesses. These requests were granted over the objections of defendant. In general, the items the court required defendant to produce substantially aided the plaintiff's case: research and development records, engineering drawings, and examples of KMAG documents with relevant signatures.

The only issue on which this litigation could be called "close" is inequitable conduct. There is no evidence in the record, however, that the failure to cite the Upjohn '299 Patent to the Examiner was known by the defendant during the period it infringed the '335 Patent.

In weighing the closeness of the litigation and the parties' procedures and tactics, the Court finds the case rises to the level of being exceptional under § 285. In determining whether to award attorney fees, the decision is informed by the Court's familiarity with the matter in litigation and the interest of justice. The defendant's conduct during the case, designed to obfuscate and frustrate rather than promote the litigation process, is directly related to its having copied the plaintiff's invention. In this circumstance, it would be inequitable to deny an award under § 285 where a party has to overcome substantial hurdles it should not have had to confront in order to vindicate its statutorily protected rights. The Court will order

defendant to pay plaintiff's reasonable attorney fees.

## PART TWO: THE KMC PATENTS

Defendant has filed a counterclaim against Afros, alleging the FPL heads infringe its '128 and '515 Patents. The initial question is whether the assignment of patent rights, for the purpose of bringing the counterclaims, after this litigation commenced was valid. The Court concludes that although the assignment became valid at a later date under West German law, United States patent law does not permit KMC to file the counterclaim because it was not the owner or assignee of the Patents when it filed the counterclaims. In the alternative, the Court will analyze the issues of validity and infringement, finding the '128 and '515 Patents valid but not infringed.

## VIII. PATENT ASSIGNMENT

Plaintiff originally filed suit against KMAG and KMC on June 29, 1984. On July 25, 1984, KMAG filed motions to quash service and dismiss for lack of *in personam* jurisdiction. KMAG then assigned the '128 and '515 Patents to KMC on September 14, 1984, PX 135, and KMC filed its infringement counterclaims on September 19, 1984. Dkt. 20. In granting KMAG's motion to dismiss, the Court "inferred that the assignment of the patents was motivated by this lawsuit, [and] on this record plaintiff has not demonstrated the assignment or the act of KMAG was invalid." *Afros, S.p.A. v. Krauss-Maffei Corp.,* 624 F.Supp. 464, 468 (D.Del.1985). The question of the assignment's validity has reared its head once more, this time in the context of whether KMC has standing to bring the counterclaim under 35 U.S.C. § 281. Plaintiff argues the assignment is invalid because of faulty execution of the transfer document under West German law, and that KMC is not an owner or assignee of the '128 and '335 Patents under United States law, with no standing to assert the counterclaim.[37]

---

**37.** Defendant submitted a motion for partial summary judgment to find the patent assignment between KMAG and KMC valid under West German and United States law. Dkt. 140.

Mr. Manfred Petersen, at the time of the purported assignment the General Manager of KMAG's urethane machine and production plant, decided the counterclaim should be brought against Afros. Petersen also determined the KMAG patents should be transferred to the United States daughter corporation, KMC, and effected the assignment without consulting either KMAG officers or the KMC Board of Directors.[38] Defendant's counsel prepared the document, written in English, and transmitted it to Mr. Petersen at KMAG's headquarters in Munich, West Germany, where it was executed. The key to the document is the form of the signatures:

> Krauss-Maffei
> Aktiengesellschaft
> /s/
> _____
> By: Manfred Petersen
> Title: General Manager

Dated: 14. September 1984

Attest: Bernd Rucker

/s/
_____
(Secretary)

PX 135. The second signature was provided by Mr. Bernd Rucker, the head of KMAG's Patent Department.

The parties agree and I concur that the law of the situs of the assignment, West Germany, controls the question of the validity of the assignment, while United States law determines whether KMC was a valid assignee of the patents at the time it filed the counterclaims. The distinction as to which law governs is crucial because the timing of the assignment determines whether KMC has standing to allege infringement of the '128 and '515 Patents.

## A. Validity of Assignment Under West German Law

Under West German law, an *Aktiengesellschaft*, a corporation, must have all documents and transactions signed by two members of the corporation's managing board. In addition, statutory authority permits two prokurists, those with a general power of attorney, to sign the documents. The West German law recognizes a more limited authority, called *handlungsbevollmachtigte*, a commercial power of attorney, that permits a corporate employee to conduct business on behalf of the corporation in a limited array of transactions. Mr. Rucker possesses this power. The statute requires those exercising the prokurist power to place after their signature the initials "PPA," and a person using the commercial power of attorney must write "i.V." after the signature. Failure to follow this formal requirement does not affect the validity of the transaction. Tr. 893. The parties' West German law experts agree that determining whether a corporate officer exercised a particular power depends on the intent at the time of signing the document and completing the transaction.

West German law also permits a corporation to adopt alternative signature rules in order to bind the corporation. KMAG's by-laws allow the signatures of *gesamtprokurits*, joint prokurists, to bind the corporation. A joint prokurist cannot bind the corporation on the basis of a single signature. Tr. 889. Mr. Petersen and Mr. Jurgen Peter Hingst, head of KMAG's RIM Division and chief executive of KMC at the time of the assignment, were joint prokurists. Mr. Hingst did not sign the assignment, and indeed did not learn of it until a deposition in April, 1985, seven months later. *See Afros*, 624 F.Supp. at 467.

The experts agree Mr. Petersen and Mr. Rucker did not execute the assignment under the statutory powers of corporate representation. Tr. 894-96; 1133-34. Another basis on which the transaction can validly rest is general principles of agency law. The West German Supreme Court recognizes both express and implied agency powers for corporate officers to bind the enter-

---

The motion was submitted less than two weeks before trial. The Court held it in abeyance and the issue was tried during the parties' presentations. The motion will be denied for the reasons stated in this section of the opinion.

**38.** The relationship between KMAG and KMC, and Mr. Petersen's role in the transaction are described in the Court's earlier opinions on jurisdiction and discovery. 624 F.Supp. at 467; 113 F.R.D. 127, 131–32 (D.Del.1986).

prise, including those with the power of a joint prokurist and a commercial power of attorney to jointly authorize a transaction. Although there is no evidence in the record of an express delegation of authority, certain documents concerning unrelated patent transfers contain the signatures of Messrs. Petersen and Rucker, showing they acted together to bind the corporation. *See* PX 170. Based on the experts' testimony and the documents, the Court finds Mr. Petersen and Mr. Rucker had an implied agency power to bind KMAG when exercising the joint prokurist power and commercial power of attorney.

Under Mr. Petersen's signature appears "General Manager," which connotes he signed in his official capacity. Although he does not have a clear recollection of signing the document, the Court finds Mr. Petersen's testimony credible concerning his intent to bind KMAG, Tr. 1061, and the form of the signature demonstrates Mr. Petersen exercised his joint prokurist power. The central issue is whether Mr. Rucker signed the assignment with the intent to exercise his commercial power of attorney and bind KMAG. Under his signature appears the word "Secretary," which is not his corporate position, and over the signature is the word "Attest." The form of the document is not clear on its face as to whether Mr. Rucker exercised his agency power in signing the assignment because it neither states his official position nor uses "i.V." to denote his commercial power of attorney.

The assignment was drafted in English, and the term "Attest" does not have a direct analogue under West German law for corporate transactions. The word translates as *"bestatigt,"* which also means "confirm" in German, but normal West German corporate practice does not require a witness for a signature. The meaning of "confirm" in this context is questionable, Tr. 1140, and the experts disagree as to exactly how it should be construed. The assignment document does not furnish evidence on its face of Mr. Rucker's intent to exercise his commercial power of attorney by either specifically stating his corporate office or using the "i.V." symbol of the commercial power of attorney.

Mr. Rucker's testimony concerning his intent is equally unclear, and contradictory in certain respects. He stated at a deposition taken during trial that he had not discussed the assignment document prior to signing it, Deposition of Bernd Rucker, Dkt. 150, at 26–27, but at trial stated he reviewed it extensively with counsel prior to signing it. Tr. 1036–38. Mr. Rucker stated he clearly understood why he was to sign the document, but does not recall the content of the conversation with counsel. Mr. Rucker testified he believed the assignment document to be valid under both American and German law, although he had reservations about its validity. Tr. 1042. He stated he intended to exercise the commercial power of attorney in signing despite the lack of an "i.V." on the form and use of the ambiguous term "Attest." Tr. 972, 1044. Mr. Rucker also stated, "I have assumed this or I have based myself on this." Tr. 970.

Mr. Rucker had previously been involved in the assignment of a United States patent from the inventor to KMAG. DX 243. On that document, his signature appears as that of a witness, without the initials "i.V." Other documents produced by KMAG show the signature under the "i.V." PX 170. In considering Mr. Rucker's testimony, especially the Court's examination, I find the statements concerning his intent are not credible. The overriding impression is one of hindsight explanation in order to meet legal requirements Mr. Rucker only became aware of after the assignment. At best, he believed his signature sufficient for an assignment under United States patent law, where he need not exercise the commercial power of attorney. The documents support this finding because the only other example of an assignment by KMAG shows Mr. Rucker signing as a witness, not as a corporate agent. Therefore, the Court finds Mr. Rucker did not intend to apply his commercial power of attorney to execute the assignment, and under West German law the assignment was not a valid exercise of KMAG's corporate powers.

The inquiry does not end at this point because West German law recognizes transactions falling outside the proper exercise of an officer's power may be subsequently ratified by the corporation. The law recognizes a transaction's "pending validity," a state in which it is neither valid nor invalid until later approval by an officer with the power to ratify on behalf of the corporation. Tr. 925. Under the West German Commercial Code § 184(1), "Subsequent assent (ratification) operates from the moment when the legal transaction was entered into, unless otherwise provided." DX 239. Two members of KMAG's Managing Board ratified the assignment on January 8, 1987, acting according to their statutory authority. DX 233. Moreover, on April 29, 1985, at a deposition, Mr. Hingst, who was Mr. Petersen's superior, learned of the assignment and never objected to it. Defendant argues Mr. Hingst's failure to object qualifies as a ratification of the transaction, and as a joint prokurist he acted in conjunction with Mr. Petersen to effect the assignment under the applicable statutes. Whether the date of ratification is April 29, 1985 or January 8, 1987 is irrelevant because the assignment did become valid at some point after September 19, 1984, the date KMC filed the counterclaim. Therefore, although Mr. Rucker failed to exercise the commercial power of attorney to make the assignment valid initially, the corporation's subsequent assent creates a valid transaction under applicable West German law.

### B. Validity of Assignment Under United States Law

In order to sue for infringement under 35 U.S.C. § 281, the plaintiff must be the owner of the patents, i.e., the patentee or assignee of the patent. The standard for determining whether a transfer is an assignment or a license was stated in the seminal decision of *Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891):

> The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention through the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that it necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff.

*Id.* at 255, 11 S.Ct. at 335 (citations omitted). Whether one is an assignee or not is crucial because the failure to assign all rights under the patent bars a claim for infringement unless the owner is made a party to the suit. The particular name given to the instrument does not control its construction as a license or assignment. *Id.* at 256, 11 S.Ct. at 335–36; *see Allen v. Werner*, 190 F.2d 840, 842 (5th Cir.1951) (reference to parties as licensor/licensee not controlling).

Plaintiff argues that a patent cross-license agreement between KMAG and Elastogran Maschenenbau GmbH ("Elastogran"), a rival mixing head manufacturer, for the '128 and '515 Patents, entered into in 1975 and amended in 1984, demonstrates KMAG has not assigned complete rights to KMC. PX 194, 196. Specifically, KMAG receives royalties for world-

wide sales by Elastogran, including those in the United States, and it is not barred from manufacturing under the license outside West Germany. The retention of the right to receive royalties does not necessarily convert the transfer into a license. *TWM Manufacturing Co. v. Dura Corp.*, 189 U.S.P.Q. 518, 526 (E.D.Mich.1975). The primary rights in any patent are exclusivity, the right to transfer, and most importantly the right to sue infringers. *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 38–39, 43 S.Ct. 254, 257–58, 67 L.Ed. 516 (1923). The assignment instrument clearly transfers all interest in the '128 and '515 Patents to KMC without reservation, including the right to sue. PX 135. The Elastogran cross-license dates back ten years before the assignment, and plaintiff did not introduce evidence to show what rights, if any, KMAG retained through the license after the assignment to KMC. On its face, the transfer meets the statutory requirements of 35 U.S.C. § 261, and in the absence of any direct evidence showing KMAG has retained rights to the Patents it must be construed as an assignment rather than a license.

The troublesome validity question under United States law concerns whether the assignment was effective for purposes of giving KMC standing to bring their infringement counterclaim on September 19, 1984. If KMC were neither the assignee nor owner of the patent on that date, it cannot bring suit for infringement under 35 U.S.C. § 281. The policy rationale for limiting the right to bring an infringement suit to those who possess all rights to the patent is to permit complete adjudication of a dispute in order to protect the patent owners' rights and the public's access to the technological innovation contained in a patent. As the Supreme Court noted in *Crown Die & Tool Co.*, permitting nonowners or licensees to sue "would give the patentee an opportunity without expense to himself to stir up litigation by third persons that is certainly contrary to the purpose and spirit of the statutory provisions for the assignment of patents." 261 U.S. at 39, 43 S.Ct. at 257.

In *Switzer Brothers, Inc. v. Byrne*, patent owners attempted by quitclaim notices to assign their rights to the appellant, two years after the infringement suit commenced. The United States Court of Appeals for the Sixth Circuit stated, "The right of the plaintiff to recover depend[s] upon its right at the inception of the suit and the nonexistence of a cause of action when the suit was started is a fatal defect which cannot be cured by the accrual of a cause of action pending suit." 242 F.2d 909, 913 (6th Cir.1957). *See Clayhill Resources, Ltd. v. MSB Industries, Inc.*, No. 80 Civ. 11645 (RLC) (S.D.N.Y. Nov. 3, 1980) (agreement assigning plaintiff right to sue for infringement retroactive to date prior to filing suit ineffective to grant standing). The law clearly cannot permit a plaintiff to *nunc pro tunc* a cause of action if the rule that only patent owners and assignees may sue for infringement is to have any meaning.

The courts generally will not inquire into the parties' motivation for an assignment so long as the transaction meets the statutory requirements of 35 U.S.C. § 261. *Discovery Rights, Inc. v. Avon Products, Inc.*, 182 U.S.P.Q. 396, 397–98 (N.D.Ill.1974); *Colibri Lighters (U.S.A.), Inc. v. Jacques Kreisler Manufacturing Corp.*, 238 F.Supp. 365, 368 (S.D.N.Y.1965). The problem in the present case, however, is that on September 19, 1984, when KMC counterclaimed, the assignment was not valid under applicable West German law, having only "pending validity." *Supra*, text at 1444. The subsequent ratification relates back to the date of the transaction under West German law regardless of whether KMAG ratified when Mr. Hingst learned of the assignment in April, 1985, or the January 8, 1987 corporate ratification. The key question is whether a later act can cure a defect in an assignment when the assignment would not have been legally effective at the time the infringement action (or counterclaim) was filed.

Relation back is a legal fiction to permit, *inter alia*, a corporation or principal to make enforceable against itself an agreement or act that would otherwise fall out-

side the scope of the officer's or agent's authority. The West German Commercial Code § 184(1) permits the ratification to relate back to the date of the transaction. The principle of relating back in time serves the limited purpose of creating liability or a contractual obligation against the assenting party. This concept cannot, however, overcome the important policies supporting the standing requirements of United States patent law. Courts generally enforce the rule that a nonexclusive licensee alone may not sue for infringement, and that the patent owner, assignee, or exclusive licensee of a patent must be made a party to the suit. *See* D. Chisum, *Patents*, § 23.03[3]. Permitting a presently invalid assignment to serve as the basis of a claim under 35 U.S.C. § 281 on the ground that it later "became" valid, which ratification transposes itself back in time, will impermissibly expand the class of persons able to sue for infringement. Moreover, permitting a claim where a foreign nation's law provides the basis for avoiding the owner/assignee rule may give foreign United States patent owners a distinct advantage over their domestic counterparts by allowing them to manipulate the scope of their liability through a transaction subsequent to the filing of the suit.

██ Congress has restricted the right to sue for infringement to a narrow range of parties: owners and their assigns. As of the date of KMC's counterclaim, September 19, 1984, it fell outside that range because the assignment was not currently valid. Although a subsequent act may effectively ratify a prior invalid act in other areas of the law, I hold that subsequent acts cannot alter the status of an assignment in order to confer standing on a party that otherwise could not bring an infringement claim under United States patent law.

Very few cases have considered the retroactive effect of an assignment on a party's standing to bring an infringement claim and the Court of Appeals for the Federal Circuit has not yet spoken on this subject. Therefore, the Court will also consider the substantive patent law questions relating to the '128 and '515 Patents in order to resolve all issues presented by the parties.

## IX. VALIDITY OF THE '515 AND '128 PATENTS

The Court remains mindful of the presumption of validity attaching to the defendant's Patents, 35 U.S.C. § 282, and that the burden of proof rests on plaintiff to demonstrate invalidity by clear and convincing evidence. Plaintiff argues the '515 Patent is invalid under § 103 because there was simultaneous invention of the component recirculation grooves. The '128 Patent, according to plaintiff, is inoperative as disclosed by the figures used to illustrate the operation of the Patent. The Court will consider the Patents separately.

### A. The '515 Patent

The parties presented minimal evidence concerning this Patent. Plaintiff relies on the statements of one witness concerning inventorship of recirculation grooves and an uncited prior art patent, while defendant primarily relies on the presumption of validity. The parties did not directly address the four-factor *John Deere* test, but sufficient evidence exists in the record to adequately analyze whether the '515 Patent is obvious.

### 1. Scope and Content of the Prior Art

United States Patent No. 3,674,398 awarded to Sigfried Baumgartner *et al.* ("Baumgartner '398 Patent"), which was not cited in the '515 Patent prosecution, is entitled "Scavenging system for Injection-Molding Machine." It has a foreign priority date of June 24, 1969, and the '515 Patent has a February 20, 1970 priority date. The Baumgartner '398 Patent discloses exhaust channels for cleaning residual polyurethane material from the inlet nozzles and the mixing chamber. "The general object of our present invention is to provide means in such a machine for flushing residual polymeric material from the supply channel immediately after every feeding phase, thus before the hardening particles adhere firmly to the channel walls." PX 146, col. 1, lines 55–59. Exami-

nation of Claims 20 and 21 of the Patent disclose the means for moving the mixing piston and providing the scavenging function. The piston has grooves bored into the side to permit the scavenging fluid or compressed air to clean the mixing chamber and supply channels when the head is not in operation. PX 146.

The primary teaching of the Baumgartner '398 patent is for cleaning residual polyurethane from the mixing head prior to the next operation. Although the "slide valve" used to open and close the head has grooves cut into the side of the moveable piston, those channels are designed to permit the scavenging agent to fully dislodge all residual material. The specification states compressed air circulation is the preferred method for cleaning the chambers. The Patent does not speak to recirculation of the polyol and isocyanate, and the design appears to control the introduction of those materials through pumps that are not in continuous operation. The only potentially recirculating material is the scavenging agent, but if compressed air is used an exhaust port means discharges it into the atmosphere after it has traversed the channels.

The now-familiar Mr. Fritz Schneider testified he worked on the recirculation concept in 1971 when he was employed at Elastogran, a competing enterprise. A brief exchange during plaintiff's cross-examination disclosed the following about the development of high-pressure component recirculation:

Q In your direct you mentioned recirculation grooves in the single piston in the '515 patent.

Mr. Schneider, isn't it a fact that when you became employed by Elastogran in 1971 you independently developed and designed the exact same principle for a mixing head?

A Yes, it was not only me alone, but there were more people involved than me.

Q Was your design and development of Elastogran of the identical recirculation principle totally independent from anything at Krauss-Maffei?

A We didn't know what was going on at Krauss-Maffei.

Tr. 1387. The responses are not entirely clear, but it demonstrates recirculation of the components presented a severe problem for the industry. Mr. Schneider's response, however, is specifically directed to developments in 1971, a year after the '515 Patent application had been filed. Developments in the industry after the '515 Patent filing date cannot qualify as prior art. Moreover, the record does not show whether those developments even embody the principle of component recirculation through grooves bored into the mixing piston. The testimony does not permit the Court to find other prior art or knowledge among those skilled in the art on recirculation grooves beyond the Baumgartner '398 Patent.

### 2. Differences Between the Claimed Invention and The Prior Art

The key difference between the '515 and Baumgartner '398 Patents is the latter does not embody high-pressure recirculation of the chemical components. The use of grooves in the side of the mixing piston in the Baumgartner '398 Patent bears a general resemblance to the '515 Patent. Specifically, both Patents permit some type of operation after the head closes. The law requires the Court to compare the Patents as a whole, this comparison demonstrates their disparity. The Baumgartner '398 Patent's system is for a third element unrelated to the production of polyurethane materials, and the scavenging agent is not recirculated back through the system. The '515 Patent, on the other hand, discloses recirculation of the polyol and isocyanate at high-pressure. The Baumgartner '398 Patent teaches a method for cleaning out residual material, while the '515 Patent discloses the entirely different principle of component recirculation.

### 3. Secondary Considerations

The secondary considerations can be of critical importance; unfortunately, the parties did not directly address this area. Reviewing the evidence as a whole, two items

**1448**

provide some secondary evidence relating to the obviousness of the '515 Patent.

Straight-line mixing heads embodied in the teachings of the '515 Patent were sold, because plaintiff introduced testimony that it had replaced KMAG mixing heads based on the '515 Patent with its own FPL heads. Tr. 593. Both Mr. Schneider and Dr. Macosko testified as to the general market and industry acceptance of the '515 Patent. Tr. 1429 (Schneider); 1579 (Macosko). Defendant neglected, however, to introduce evidence regarding sales, production, or profits from its straight-line mixing heads. Although the testimony will be accorded some weight, defendant's failure to produce quantifiable evidence on this question reduces the credibility of any commercial success consideration to a minimum.

The second factor that has some significance is the duplication of the '515 Patent's recirculation grooves in the '335 Patent. The Court can find no significant difference on this aspect of the design between the Patents, which demonstrates the utility of defendant's '515 Patent. The Court draws this inference from its own review of the drawings and Patent specifications. Defendant alluded to, but failed to introduce evidence beyond Dr. Macosko's conclusory statements that the industry generally adopted the recirculation grooves. While entitled to some weight, it is necessarily limited.

### 4. Ordinary Skill in the Art

The sole evidence on this issue came in relation to the '335 Patent, and focused on the period from 1970 to 1977. The Court found the person of ordinary skill in the art to possess a degree in mechanical engineering with experience in mechanical design and some understanding of fluid dynamics principles. The problems faced in the period 1968–70, when the '515 Patent was developed, were different from those encountered by Dr. Fiorentini in that high-pressure mixing heads had not been marketed. The industry's need for a good high-pressure mixing head that would pour from a head to form acceptable products remained relatively constant and only the means of

achieving that goal changed from 1968 to 1977. The Court finds the level of ordinary skill in the art would not have advanced in any significant degree between the invention of the '515 and '335 patents because the basic principles of high-pressure mixing had not changed. Therefore, the finding for the '335 Patent is adopted for the present inquiry. *See supra,* text at 1418.

### 5. Conclusion

In weighing the evidence, the most significant issue is whether the Baumgartner '398 Patent renders the '515 Patent obvious. Plaintiff argues the prior patent discloses recirculation grooves bored into the mixing piston. In addition, plaintiff points to the Inventor Reports of Mr. Rudi Keuerleber and Mr. Fritz-Wilhelm Pahl, the named inventors of the '515 Patent, submitted to KMAG wherein both men claim a 100% contribution to the patent. PX 93, 94. Mr. Schneider testified that Elastrogran developed a recirculation system for high-pressure heads around 1971. Taken together, according to plaintiff, these independent developments prove a simultaneous invention and demonstrate recirculation grooves would be obvious to one with ordinary skill in the art.

The weakness in the argument is the Baumgartner '398 Patent does not teach high-pressure recirculation of components but a system for cleaning or "scavenging" the mixing head. The superficial similarity between the Patents in undermined when both the teaching and design are reviewed in detail. The Baumgartner '398 Patent does not truly embody a recirculation system, especially when compressed air is used, because the scavenging agent is discharged from the head. Similarly, Mr. Schneider's brief testimony on developments at Elastrogran, which occurred *after* the '515 Patent application, does not clearly show what results were produced or how that effort disclosed the obviousness of recirculation grooves. The testimony cannot be accorded any weight due to its vagueness and the failure to produce specific

facts showing any simultaneous inventorship.

The assertions of Messrs. Keuerleber and Pahl concerning their independent development of the '515 Patent's recirculation system provides some limited evidence for the inference that the invention was obvious. That evidence, however, stands essentially alone in light of the Baumgartner '398 Patent's teaching and Mr. Schneider's ambiguous and unsupported testimony. Moreover, the documents on which plaintiff relies to prove contemporaneous inventorship are internal KMAG forms filled out by the inventors, and it is not clear what the statements concerning inventorship mean. There is no explanation in the record of how Messrs. Keuerleber and Pahl developed the '515 Patent, and whether they were truly independent in their development of the invention. Both men worked in the same department at KMAG, and the Court cannot conclusively infer from their reports that each developed the recirculation grooves separately.

Plaintiff bears the burden of proving obviousness by clear and convincing evidence, and simply relying on statements of independent inventorship will not suffice to sustain the burden. Moreover, the secondary evidence, although of limited weight, provides additional support for nonobviousness. The Court finds plaintiff has not proved the '515 Patent obvious in light of the prior art.[39]

### B. The '128 Patent

Plaintiff argues the figures for the '128 Patent disclose a completely inoperative device, and therefore the Patent's description violates the enablement requirement of 35 U.S.C. § 112, first paragraph.[40] The figures exhibit two serious flaws.[41] First, the recirculation grooves, numbers 21 and 22 on Figure 1, are shown as retracted into the hydraulic fluid storage area. If constructed according to the figure, the grooves would become filled with hydraulic fluid and, when advanced, permit the chemical components to mix with the fluid. This would severely affect subsequent shots because the components would be contaminated with the hydraulic fluid. The second flaw relates to the placement of the pumps, numbers 27 and 18 on Figure 1, for injecting and recirculating the polyol and isocyanate. The pumps are on the component return lines, numbers 10 and 11, which means when the mixing piston is retracted there is no pressure to inject the components. The design portrayed would have the pumps effectively creating a vacuum in one line and providing no pressure in the other to permit impingement in the mixing chamber, an obviously inoperative configuration.

"To be enabling under § 112, a patent must contain a description that enables one skilled in the art to make and use the claimed invention." *Atlas Powder Co.*, 750 F.2d at 1576; *see Lindemann Maschinenfabrik*, 730 F.2d at 1463. The focus must be on one skilled in the art because the specification need not exhibit all potential applications of the claims, *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1121 (Fed.Cir.1985) (*en banc*) (plurality opinion), and a degree of experimentation may be necessary under the patent. *Atlas Powder Co.*, 750 F.2d at 1576.

---

**39.** Plaintiff relies primarily on a statement concerning contemporary inventorship in *In re Merck & Co.*, 800 F.2d 1091 (Fed.Cir.1986), to support its obviousness argument. The Court of Appeals for the Federal Circuit stated "evidence of contemporaneous inventorship is probative of 'the level of knowledge in the art at the time the invention was made.' *In re Farrenkopf*, 713 F.2d 714, 720 (Fed.Cir.1983)." 800 F.2d at 1098. The evidence here does not truly reveal contemporaneous invention beyond the possible inference of sole inventorship by Messrs. Pahl and Keuerleber, a circumstance distinct from *In re Merck*. Moreover, even if proved, contemporaneous invention is one factor in assessing obvi-

ousness, and the evidence concerning the '515 Patent weighs against such a finding.

**40.** Plaintiff also argues the non-utility of the '128 Patent under 35 U.S.C. § 101. The two arguments rest on the same foundation, *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 959 (Fed.Cir.1983), *cert. denied*, 469 U.S. 835, 105 S.Ct. 127, 83 L.Ed.2d 69 (1984), and the Court will only treat the § 112 argument.

**41.** Figure 1 of the '128 Patent is reprinted in the Appendix.

The plaintiff's argument is not persuasive because it does not, and cannot point to any language in the claims or specifications exhibiting the deficiencies shown in the figures. Claim 1 states in part "[a] means operatively associated with said mixing chamber for injecting a pair of reactive components into said mixing chamber in opposing and impinging jets to form a mixture therein," and Claim 2 provides for a "piston being formed with passages for recirculating said components in said advanced position." DX 9, col. 4, lines 43–46, 66–68. The specification is similarly silent with regard to the location of the pumps and the area of retraction of the recirculation grooves when the piston is open.

■■■ The presence of inaccurately drawn figures does not, standing alone, establish inoperativeness or a failure to provide the requisite specifications. *See R.E. Phelon Co., Inc. v. Wabash, Inc.,* 640 F.Supp. 1383, 1397 (N.D.Ind.1986), *aff'd in part, vacated in part,* 824 F.2d 977 (Fed. Cir.1987). The claims and specifications are directed to persons skilled in the art, and the entire patent must be considered. Dr. Macosko testified the pumps are not an important part of the patent, and the specific design of a hydraulic system is unnecessary to the patent. Tr. 1599–1601. The other patents in suit refer to pumps and the system required to power the piston movements in only a cursory way, in order to explain how the system will operate. The proper focus of the '128 Patent is the configuration of the head and use of two cleaning pistons.

■■■ The Court finds the person of ordinary skill in the art would use the figures as, at best, a guide. They do not exhibit the entire invention claimed in the '128 Patent nor limit it to the particular design shown. Figures with inoperative aspects not otherwise described or claimed in the patent do not, on their own, demonstrate inoperativeness or an inadequate specification under § 112, first paragraph. Plaintiff has not carried its burden of proving the '128 Patent invalid.[42]

## X. INFRINGEMENT

■■■ Defendant argues the FPL heads both literally infringe the '515 and '128 Patents, and infringe the '128 Patent under the doctrine of equivalents. For literal infringement, the Court must undertake a two-step analysis: 1) interpret the language of the claim; 2) determine whether the claims read on the accused device. *Standard Oil Co.,* 774 F.2d at 452. If literal infringement cannot be proven, the Court may find infringement when the accused product and claimed invention perform substantially the same function in substantially the same way to yield substantially the same result. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950). The doctrine of equivalents, which is essentially an equitable response to the strictures of proving literal infringement, is limited where the prosecution history of the allegedly infringed patent "precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of [the] patent application." *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed.Cir. 1983).

### A. '128 Patent

#### 1. Literal Infringement

The first issue requiring interpretation of the claims concerns the location of the inlet nozzles and length of the mixing chamber. Claim 1 describes the placement of the nozzles in diametrically opposed positions, DX 9, col. 4, lines 43–46, but does not locate them any specific distance from the discharge chamber. Reference to the operational description in the specification sheds light on the length of the mixing chamber. The '128 Patent specification de-

---

**42.** Plaintiff made frequent reference at trial to KMAG's failure to ever commercialize a mixing head based on the '128 Patent claims or figures. Although this evidence would affect an obvious- ness analysis because commercial success is one of the factors the Court must consider, it does not demonstrate the inoperativeness of the Patent claims or otherwise affect its validity.

scribes the operation in the following terms:

> To start the [mixing] piston 3 is held in the retracted position and the [cleaning] piston 16 in the *advanced position* shown in FIG. 1. Polyisocyanate is introduced through inlet 9 and and [sic] polyol is introduced through inlet 8 such that these two components *mix and react in the [mixing] chamber 1.*
>
> Then, as shown in FIG. 5, the piston 16 is retracted by pressurization of the chamber 32′ and depressurization of chamber 32″ until its lower end 17 lies above the mouth 5 of the chamber 1.
>
> \*    \*    \*    \*    \*    \*
>
> Such an arrangement can be relied on regularly to produce workpieces of identical characteristics. The mixture can even be fed into open molds since it is relatively calm when ejected from the [discharge] chamber 12. Moreover, there is virtually no possibility that the material will harden in either of the chambers 1 or 12 since these chambers are both effectively emptied by their respective pistons 3 and 16.

DX 9, col. 4, lines 1–9, 24–31. (Emphasis added). The description is of an operation where the mixing chamber is closed at both ends, and therefore the size of the shot is restricted to the volume of the chamber.[43]

Although a batch process is not the sole method of operation claimed, it is the mode recommended by the inventor. In order to produce a volume great enough to fill a mold in a batch process, the length of the mixing chamber would necessarily have to be substantial. Figures 1, 5, and 6 of the Patent, exhibiting its operational form, also show a relatively long mixing chamber. The component inlet nozzles in mixing heads are usually placed a short distance from the mixing piston's face because the piston serves as the rear wall of the mixing chamber and permits the flow to move toward the discharge chamber and into the mold. If the inlet nozzles are located a substantial distance from the discharge chamber then the length-diameter ratio will be high. The claims, specification, and figures do not provide different configurations for batch and continuous operation. Fairly read, they disclose only a single design usable in both operations. Claim 1, the independent claim describing the design, applies a singular structure for producing polyurethane. In light of the specification's description of a batch process, the Court interprets the Claims as providing for the location of the inlet nozzles a sufficient distance from the discharge chamber to have a mixing chamber of the requisite volume to operate a batch process.[44]

The final, and perhaps most important question of claim interpretation concerns the relative sizes of the chambers. Claim 1 states the discharge chamber shall have "a cross-sectional area *equal* to that of said mixing chamber and a width greater than that of the inlet opening into it from said mixing chamber...." DX 9, col. 4, lines 39–42 (Emphasis added). Claim 9 contains identical language on the relative chamber sizes. Claim 8 states, "The apparatus defined in claim 1 wherein said chambers are of substantially equal cross-sectional areas." DX 9, col. 5, lines 19–21. Dependent Claims 5 and 6 describe discharge chambers of rectangular and circular configuration, respectively. DX 9, col. 5, lines 7–15. The claim language appears to be internally inconsistent if the chambers are cylindrical because the cross-sectional area, i.e., the width, would have to be equal, while the Patent calls for the discharge chamber's width to be greater than the mixing chamber's. Defendant does not contest the internal inconsistency in the claims as ap-

---

**43.** *See supra,* note 13.

**44.** The reactive nature of the components used in the various polyurethane compounds makes it generally unfeasible to pour more than one shot into a mold for most products. Using polyurethane delivered at two different times may result in a poorly formed product because the polyurethane will harden at different times and the flow may not spread evenly in the mold when an amount less than the total volume required is used. For a mixing head using a batch process, it would have to have a mixing chamber volume large enough to fill a mold in a single shot if it were to have any broad commercial application.

plied to cylindrical chambers if "equal" is interpreted to mean the chambers must have a strictly uniform cross-sectional area.

The meaning of "equal" in Claims 1 and 9 is the subject of a substantial dispute. In reviewing claims, the Court must consider extrinsic evidence, i.e., the specification, prosecution history, and other claims in order to determine the scope of the disputed claim. *Howes v. Medical Components, Inc.*, 814 F.2d 638, 643 (Fed.Cir. 1987). Defendant argues the term should mean "at least equal to," in light of the specification. Moreover, defendant asserts Claim 8's provision for chambers of "substantially equal cross-sectional areas" means "equal" cannot be limited in meaning to absolute identity in size between the chambers because that would render meaningless the limitation of the dependent claim. Plaintiff essentially argues the standard, common sense meaning of "equal" as requiring the chambers to be of the same size.

The specification states the chambers' cross-sectional areas be "at least the same size," and "it is advantageous that the amount of fluid displaced on the stroke of the mixing piston be the same as that displaced on each stroke of the quiescence piston." DX 9, col. 2, line 49. In the description of figure 4 which exhibits a batch process, it states "the strokes of the two pistons 16 and 3 [cleaning and mixing] are the same and their cross-sectional areas are the same so that the volumes displaced by them on reciprocation from one end position to the other are equal." DX 9, col. 3, lines 63–67.

The prosecution history sheds important light on the meaning of the seemingly contradictory terms. The above-referenced statements from the specification were in the original application filed April 9, 1974. DX 229, at 12–13, 15. The original claims did not specifically provide for the width of the discharge chamber being larger than the opening from the mixing chamber. The Examiner rejected all relevant claims as anticipated by the prior art on March 24, 1975. DX 229, at 48.

Defendant filed amended claims on October 10, 1975, adding the language now appearing in Claim 1 that the discharge chamber have a "cross-section greater than that of the inlet opening into it from said mixing chamber." DX 229, at 53. Defendant stated the amendment defined the invention "more sharply," and disclosed the discharge chamber as having "a calming effect upon the flow as it is displaced into the mold." DX 229, at 58. Further discussion with the Examiner on December 12, 1975, revealed continuing problems with patentability over the prior art. DX 229, at 64. Additional amendments were submitted, and defendant again argued the patentability of the invention. In the accompanying "Remarks," defendant stated:

Claim 5 has been amended as discussed with the Examiner.

In structural terms, the claims now distinguish over RODDY (B) even if the chamber 26 is considered a mixing chamber and chamber 13 is considered a quieting chamber, not merely because the quieting chamber is recited to have a plunger which can drive the full length thereof to the mold cavity (not present in RODDY (B)[ ]), not merely because the claim requires the quieting chamber have a uniform cross section from its opening into the mixing chamber to its opening into the mold cavity (not present in RODDY (B)[ ]) and not merely because the claim recites opposed openings through which the two components are introduced to perform high turbulence mixing (not present in RODDY (B)[ ]), but because the claim requires that the opening from the mixing chamber into the quieting chamber have a smaller width than the width of this quieting chamber which is of uniform cross section over its length. The effect of this width difference will be apparent from FIGS. 2 through 4 of the drawing hereof and the related portion of the specification.

As pointed out to examiner SAFRAN, it is this relationship which permits the opposed feeding of high velocity stream of reactive components and the ensuing high turbulence to be passivated or quieted without detriment to the molded

product or loss of material and efficiency of injection.

DX 229, at 65–66. The prior art "Roddy" patent apparently disclosed a discharge chamber narrower at one end, and smaller then the mixing chamber.

On December 29, 1975, the Examiner required additional amendments before he would allow the claim. Claims 1 and 9 were to have the following language inserted: "cross-sectional area equal to that of said mixing chamber and." DX 229, at 71. The PTO then issued a "Notice of Allowance" on February 17, 1976. DX 229, at 73.

The final amendment responds to the Examiner's earlier problems with patentability over the Roddy prior art patent. The additional language specifies the sizes of the respective chambers in order to distinguish the claims. The question is whether the term "equal" limits the '128 patent to cover *only* discharge and mixing chambers of equal cross-sectional areas. The Patent specifications do not provide guidance on the meaning of "equal" because they were written long before the final amendment. Similarly, Claim 8 was part of the original application.

The Examiner specifically required the claim of equal cross-sections. Defendant's argument that "equal" really means "at least equal to" is flawed because the language is not subject to differing interpretations. Defendant essentially requests the Court to further amend Claim 1, or read it out of the Patent, both of which are not permissible. The final amendment creates a limitation in Claim 1 because the cross-sectional areas cannot be equal if the chambers are cylindrical and the mixing and discharge chamber widths are different sizes. The description of the claims, as exhibited in figure 4, demonstrates a design having chambers of equal cross-sections through the use of rectangular chambers. PX 229, col. 3, lines 60–67. That an amendment substantially limits a claim in a manner not initially apparent to the patentee does not affect the analysis where the language is clear.

Defendant's argument that Claim 8, as a limiting dependent claim disclosing "substantially equal" chambers, proves "equal" means "at least equal to" in Claim 1 is also flawed. The Court of Appeals for the Federal Circuit has strongly reaffirmed the rule that a limitation cannot be read into a claim to avoid infringement where the limitation already appears in another claim. *See D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985) (rule "is fixed. It is long and well established. It enjoyed an immutable and universally applicable status ..."). Defendant seeks to apply a negative corollary of this rule, that limited dependent claims demonstrate the breadth of the independent claim. A dependent claim, however, cannot override the clear meaning of the independent claim's language. Claim 1 admits of only one interpretation, the standard definitional meaning of equal: "of the same measure, quantity, amount or number as another or others...." *Websters Third New International Dictionary* 766. To hold otherwise would require the Court to wholly ignore the Examiner's requested amendment.

■ The FPL heads do not literally infringe the '128 Patent in light of the construction of the claims, for two reasons. First, the inlet nozzles on plaintiff's product are as close to the discharge chamber as possible. The '128 Patent discloses the nozzles a substantial distance from the discharge chamber, given the design permitting both a batch process and fluid communication under the claims. The differing placements mean the FPL heads do not embody the structure claimed by the '128 Patent. Second, all FPL devices have mixing and discharge chambers of unequal cross-sections, with the latter at least 30% wider. PX 151. The chambers do not have equal cross-sectional areas, and therefore do not infringe the '128 Patent.

### 2. Doctrine of Equivalents

■ In order to infringe a patent under the doctrine of equivalents, the patentee must prove by a preponderance of the evidence the alleged infringing device violates the *Graver Tank* "function, way, and re-

sult" test. Moreover, a patent's range of equivalents may be limited by its prosecution history if certain coverage or scope for the claims is given up by amendments during the prosecution. "Depending on the nature and purpose of an amendment, it may have a limiting effect within a spectrum ranging from great to small to zero." *Hughes Aircraft Co.*, 717 F.2d at 1363. In determining whether a patentee is estopped from recapturing part of a prior claim depends on the particular facts of each case. *Loctite Corp.*, 781 F.2d at 871 n. 7.

The '128 Patent application disclosed an L-shape device originally in claim 5, but there was no mention of the relative sizes of the chambers. DX 229, at 18. After the initial rejection, defendant added the following language in order to distinguish the patent over the prior art: "said quiescence chamber having a cross-section *greater* than that of the inlet opening into it from said mixing chamber." DX 229, at 53. Defendant filed a second amendment, substituting "width" for "cross-section" in the claim. This amendment was in response to the Examiner having

> ... pointed out that claim 5 also appeared to be inaccurate in the recitation of the cross[-]section, especially since the important point stressed in the specification was the relationship of the width of the opening of the mixing chamber into the quieting chamber. The undersigned agreed to insert the definition contained in the specification to the effect that *the quieting chamber had a greater width than that of the opening.*

PX 229, at 65 (emphasis added). The Examiner then required one final addition before allowing the application, the addition of "cross-sectional area equal to that of said mixing chamber and a" preceding "width" in what became Claim 1. DX 229, at 71.

Defendant's first amendment sought to claim a discharge chamber with a greater cross-sectional area than the mixing chamber. The substitution of "width" for "cross-section" was followed by a further limitation on the chamber's cross-sections by requiring that they be "equal." The clear thrust of the Examiner's insistence on further refinement of the claim was to distinguish the patent over the prior art.

■■ The range of equivalents for the '128 Patent is narrow, given the history of the limiting amendments. The FPL heads do not infringe the '128 Patent because their mixing and discharge chambers have significantly different cross-sections. PX 151. The defendant cannot recapture a claimed mixing head with discharge chambers of greater cross-sectional area after first abandoning that claim and then accepting the Examiner's additional limitation of the relative sizes of the chambers to being equal. The prosecution history limited the scope of the '128 Patent. The FPL heads are constructed in a "way" outside the range of equivalents of the '128 Patent, and defendant cannot now assert its Patent covers devices beyond those with equal cross-sectional chambers.

The Court finds the plaintiff's FPL heads do not literally infringe the '128 Patent and it is not infringed under the doctrine of equivalents in light of the prosecution history of claim 1.

### B. The '515 Patent

Defendant argues for liberal construction of the '515 Patent because the invention disclosed is a "pioneer" patent in the high-pressure mixing head industry. The key language for defendant's infringement argument is in Claim 1, the disclosure of a "housing means forming *a mixing chamber* ... and *a control slide* shiftable along said chamber...." DX 8, col. 8, lines 45–49 (Emphasis added). The FPL heads use recirculation grooves akin to that described in the '515 Patent. The question is whether the '515 Patent claim language can be interpreted to cover mixing heads incorporating two chambers, with the mixing and discharge functions performed in distinct sections of the head.

Claim 1 is phrased in the singular, and the specification describes the invention as having a "generally elongated" chamber, PX 8, col. 2, line 52. Further, it recommends providing "the end of the plunger or slide or both with a smooth face adapted to

lie flush with the end of the mixing chamber and with a wall of the mold cavity. To this end the mixing chamber preferably extends *into the mold body* and has an extremity whose face lies flush with the wall of the mold cavity." DX 8, col. 4, lines 34–40. The figures uniformly show a device with a single chamber for housing the slide valve and discharging the polyurethane into the mold.

The '515 Patent exemplifies a straight-line mixing head, and the claims are not susceptible to a broader interpretation to cover multiple chambers performing separate functions. The Court finds the FPL heads, utilizing dual chambers intersecting at a 90° angle, do not literally infringe the '515 Patent.

Defendant's argument that the '515 Patent is a "pioneer" patent is more appropriately applied in considering infringement under the doctrine of equivalents. *See Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856. Although defendant takes this position in relation to a literal infringement claim, it does not affect the analysis. Pioneer patents are entitled to "a wide breadth of protection in construing the patent claims and specifications." *Corning Glass Works v. Anchor Hocking Glass Corp.,* 374 F.2d 473, 476 (3d Cir.), *cert. denied,* 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967). *See Rite-Hite Corp. v. Kelley Co., Inc.,* 629 F.Supp. 1042, 1066 (E.D.Wis.1986), *aff'd,* 819 F.2d 1120 (Fed. Cir.1987). Defendant introduced minimal evidence of the pioneer status of the '515 Patent, relying on conclusory statements that recirculation grooves have been used widely in the industry to prove the novelty of the invention. The record does not contain evidence of prior inventions or how the '515 Patent significantly advanced the state of the art. Moreover, even assuming the Patent's pioneer status, broad construction of the claim language cannot override the clear meaning of the claims and specification. The '515 Patent applies to single chamber mixing heads, and does not disclose the L-shape design of the FPL heads.

The Court holds the FPL heads do not literally infringe the '515 Patent.

## XI. CONCLUSION

Based on the above findings of fact and conclusions of law, the Court has held: (1) the '335 Patent is valid, and defendant has failed to prove the patent issued as a result of inequitable conduct in the PTO; (2) defendant's devices infringe claims 1, 6, 8, and 9 of the '335 Patent, and the infringement is willful; (3) in light of the finding of willfulness, the Court will award plaintiff triple damages under 35 U.S.C. § 284; (4) the Court finds this to be an exceptional case, and will award plaintiff its reasonable attorney fees under 35 U.S.C. § 285; (5) the assignment of patent rights to defendant was not effective under United States Patent law to permit it to bring the counterclaim on September 19, 1984; (6) in the alternative, the '515 and '128 Patents are valid but not infringed by the plaintiff's devices.

The plaintiff shall prepare and file a proposed order, upon notice, with approval as to form by defendant, within twenty days. If the parties cannot agree on the form of order within that period, each shall submit a proposed order accompanied by an explanation of the parties' differences and their respective positions.

APPENDIX 1

UPJOHN '299 PATENT FIGURE

'335 PATENT FIGURES

FIG.1

FIG 2

FIG 3

APPENDIX 2

'128 PATENT FIGURES

MIXING
HEAD
CLOSED

FIG. 6

MIXING
HEAD
OPEN

FIG. 5